State of Iowa, Appellee, v. Ray O'Meara, Appellant.

RAPE: Sufficiency of Evidence. Evidence held amply sufficient
1　to support a verdict of guilty of rape.

RAPE: Corroboration—Principles Governing. Principles re-affirmed
2　that a prosecutrix in a charge of rape need not be corroborated in
*all* parts of her testimony; that whether there be *some* such evidence
is for the court; and that the sufficiency thereof is for the jury.
Evidence held amply corroborative.

RAPE: Other Offenses or Transactions as Evidence. Testimony as to
3　the associations and whereabouts of an accused and his coconspirator, at a time *just prior* to the transaction in question, is admissible.
Whether such evidence is also admissible as tending to show a plan
to commit the crime for which he was on trial, *quaere.*

RAPE: Voluntary Complaint by Prosecutrix. Evidence held to justify
4　instructions on the subject of voluntary complaint by a prosecutrix in a charge of rape.

CRIMINAL LAW: Witness Not Excluded Because Offered Inducements.
5　A convicted coconspirator who is offered by the state as a witness
against another conspirator may not be excluded because he (the
convicted coconspirator) had been offered inducements to confess.

WITNESSES: Cross-Examination. Testimony that witness saw, on a
6　named night, a certain make of automobile at a certain place, does
not necessarily force the court to admit, on cross-examination, testimony as to the *character* of the night, or whether witness heard
anyone scream.

CRIMINAL LAW: Competency to Testify as to Flight. A witness may
7　testify that *soon* after the commission of an offense he saw the
accused in a distant state, even though there is no showing that
accused knew that he was wanted to answer for said offense.

CRIMINAL LAW: Instructions Need Not Quote Statute. Instructions
8　need not quote sections of the statute. It is sufficient if the elements of the charged offense and all included offenses are clearly
set forth.

**CRIMINAL LAW:** Instructions Need Not Set Forth Punishment. Instructions should omit all reference to punishment, except in murder cases.

**CRIMINAL LAW:** Flight and Defendant's Explanation Thereof. Instructions may very properly direct the jury to consider, on the issue of guilt or innocence, the testimony of the State relative to flight, and the defendant's explanation thereof.

**CRIMINAL LAW:** Misconduct in Argument. It is not misconduct, in an opening argument, to picture the enormity of the offense, and its consequences, and to direct such remarks directly to the accused.

**CRIMINAL LAW:** Misconduct in Argument. An assertion in argument of a material fact of which there is no evidence is misconduct. So held where the attorney, without authority in the record, asserted, in substance that the accused had been advised to plead guilty, and ought to have taken the advice. In view of the conclusive character of the evidence, held nonprejudicial.

**CRIMINAL LAW:** Misconduct in Argument. When an incorrect statement of the law, in argument, is followed by a correct statement, all possibility of prejudice is removed.

**CRIMINAL LAW:** Presumption Prevailing as to Ruling on Misconduct. A ruling that a certain argument was "legitimate response to argument of the defense" is presumptively correct.

**CRIMINAL LAW:** Misconduct in Argument. It is misconduct for the prosecutor to argue or to state to the jury, in substance, that the accused ought to be or should be convicted because his coconspirator had been convicted on a former trial on less testimony than had been introduced against the accused. Argument in question held nonprejudicial, in view of the record.

*Appeal from Ida District Court.*—E. G. ALBERT, Judge.

MAY 11, 1920.

REHEARING DENIED DECEMBER 31, 1920.

THE defendant appeals from conviction of the crime of rape. —*Affirmed.*

*M. M. White, Wm. Mulvaney,* and *Campbell & Campbell,* for appellant.

*Horace M. Havner,* Attorney General, for appellee.

LADD, J.—I.  The defendant, Ray O'Meara, is accused in the indictment of having committed the crime of rape on Elsie Hargens, November 4, 1917.  He was then 17 years of age, as was prosecutrix.  The accused contends there was not sufficient evidence to carry the issues as to his guilt to the jury.  It appears that prosecutrix went to the home of Ida Knudsen, who was about a year younger, at about 7:30 o'clock P. M., and remained there until about 15 minutes before 9, when they went to the post office in Ida Grove, and obtained the Chicago and Sioux City newspapers, read them a while, and, a few minutes after 9 o'clock, started along the street towards the corner.  As they so did, a Ford automobile, inclosed, stopped near them, and O'Meara, who was in the car with Ernest Rathbun, invited them to take a ride.  The girls accepted, though, as they say, on condition that the car was not to leave the pavement, and that they were to get back within a half hour.  Prosecutrix sat with defendant in the front seat, and her companion with Rathbun behind.  The automobile was driven about town, and stopped near the cemetery.  After talking a while, the girls insisted on going along, and, as the boys paid no attention to this, they undertook to crank the car, and, as they failed to do so, started on foot towards town.  After they had gone a short distance, the boys overtook them; and, on invitation, the girls entered the car as before, and were driven out of town over the Maple River bridge, where defendant turned the automobile into a lane toward the rendering works, where it was stopped again.  Ida Knudsen informed the boys that, if they were not going to start the car, she would go home, and started toward town.  According to the undisputed evidence, after running a short distance, she asked prosecutrix if she was coming, and the latter responded that she couldn't.  Ida testified that prosecutrix then "screamed a heavy, shrill scream," and that she saw O'Meara grab her around the shoulders, and the last time that she saw her, "O'Meara was holding her by the shoulders."  Rathbun and prosecutrix agree that O'Meara so did, and the latter, as will appear later, admitted this.  Ida testified further that she ran to a garage near the depot without calling for help, although passing many houses which were lighted, and that, from the

<div style="margin-left:2em">

1. RAPE: sufficiency of evidence.

</div>

garage, the proprietor and a doctor took her home in the latter's automobile; and that she told them what had happened to prosecutrix. The girls were agreed that neither had seen either of the boys previous to that night, and did not know them; but O'Meara insisted that he had been in school with and had known Ida Knudsen. The latter swore that the defendant had given his name as Johnson, and that Rathbun had tried to kiss her, when near the cemetery. She admitted having done nothing to rescue prosecutrix, and explained that she did not think about giving the alarm to anyone she did not know, and did not suggest at the garage, nor offer to show the way to the car where prosecutrix had been detained. The proprietor of the garage corroborated the witness concerning what she had said there, and that she had been taken home, as did also the doctor, and said further that she wanted them to take her home, and then go back and see what became of the other girl. The prosecutrix swore to having been in the employment of Mrs. Meents in Ida Grove; that, at about 2 o'clock in the afternoon, she visited her sister, and went to the home of her parents, where she stayed until about 7:30 o'clock in the evening; and that she then went to the home of Ida Knudsen. She testified substantially as related by the latter, concerning what was done until the automobile stopped in the lane, and Ida started back to town; that she then started to get out, but that defendant held her in the seat by the shoulders; that, to Ida's question as to whether she was coming, she answered that she couldn't, and screamed; that defendant then choked her, and told her to "shut up, you damn fool, or I will kill you;" that one of the boys then took her by the feet, and the other by the shoulders, and lifted her to the ground near the car; that she was screaming all the time, and trying to get away; that the one who had carried her by the arms held her arms over her breasts, being back of her head, and that the other lifted her dress, tore open her underwear, and had sexual intercourse with her; that, immediately thereafter, the latter changed positions with the one at the head, who also had sexual intercourse with her; that all this was done without her consent, and while she was resisting to the extent of her strength; that she then got up, and, finding her hat, returned to town, and on to her home, to which she was admitted by her father; that she

went directly to her mother's bedroom, and told her what had happened; that her hair was down, and full of leaves, and her coat dirty, her face scratched near one eye, one leg scratched below the knee, and a bruise on each arm; that there was a hole in one stocking; that her underwear was torn and stained with blood. These garments were identified and introduced in evidence, as was her waist, worn that night, and appearing to have been torn. She testified that these garments were entire, previous to the ride, and that she returned to her employment at about 10 o'clock the next morning, and did a washing. Her father, mother, sister, and the sheriff corroborated her testimony that her hair was down, and leaves therein, and that she was crying; and Mrs. Meents corroborated her story as to the bruises. Dr. Conn swore that he examined her person, the following day, and found a bruise on each arm, and a scratch on her face and right leg, and that the latter was bruised; and that her sexual organ was in "an ordinary condition for a girl of her age. It was open enough to have been penetrated, and some secretions." On cross-examination, he said that there was no external laceration of the organ; that there was no hymen; but that it might be absent, and there have been no intercourse. Ernest Rathbun, who had previously been convicted of having committed rape on prosecutrix, told the story substantially as did prosecutrix, saying that O'Meara restrained her in the seat of the automobile; that they lifted her to the ground; that each had intercourse with her; and that she was struggling and trying to get away all the time; and that this happened in the lane, about 100 yards from the end of the bridge. Both defendant and Rathbun swore that, on the next day, about noon, they drove to Denison, from there on to Council Bluffs and Omaha, and then went about 30 miles west of Omaha, where they picked corn for $2\frac{1}{2}$ weeks, after which they returned to Omaha, drove to St. Joseph, Missouri, came back to Council Bluffs, and then on to the home of Rathbun's brother, about 6 miles from Ida Grove, and there learning that they were wanted, proceeded to town, the day following their return, and were arrested. Rathbun admitted having stated repeatedly that O'Meara had not had intercourse with prosecutrix, and explained that they had made it up that each would so state with regard to the other.

A girl about 16 years of age and a widow woman testified that these boys had taken them out riding, accompanied by the widow's baby, starting a few minutes after 7 o'clock in the evening in question, and that they drove to a schoolhouse about 5 miles out of town, where the women left the car, and walked back, the boys driving the automobile in. Two other young women related that later these boys accosted them from the car, inviting them to take a ride, and one of them, in answer to the question as to when she first saw them, answered:

"About half past 8 or 9,—about half past 9. Q. Do you know for sure? A. No, sir."

The defendant testified substantially as did the other witnesses, concerning the occurrences up to the time he stopped the automobile in the lane; that Ida Knudsen left the car; that he took hold of the shoulders of prosecutrix, who was sitting with him, and kept her in the seat; that, when she insisted on getting out, he allowed her to do so; that he then went down the road to look for the other girl, and was gone about 10 minutes; that, upon his return, he saw prosecutrix and Rathbun getting up from the ground; that he picked up her hat and handed it to her; that he requested her to ride back with him, and she refused, saying that if the other girl was going to walk, she was too; that she appeared to be mad at Rathbun; that Rathbun said that "he would get into a little trouble;" that "he had a hard time getting what he wanted." The witness then told of the trip to Nebraska, substantially as had Rathbun, and explained that, in the morning of November 5th, his father had refused him a team to use in picking corn for a neighbor, and had also informed him that he could not have the automobile any more, because he didn't go to church that Sunday, and denied him the privilege of riding to town with him; and that thereupon he told his father that he would leave home, and proceeded to pack his clothes, and left in his Ford automobile about noon that day,—and this account was fully corroborated by the testimony of his father and mother. The witness was cross-examined as to the occurrences in the lane, as follows:

"Q. And Ida got out there? A. Yes, sir. Q. The curtains were still on the car, weren't they? A. Yes, sir. Q. Elsie was going to get out? A. Yes, sir. Q. She tried to get out of

that car? * * * A. Yes, sir. Q. And you stopped her from get-
ting out? A. Yes, sir. Q. You held her in the car? A. Yes,
sir. * * * She didn't scream. She didn't say a word. She didn't
try to get away. * * * Q. You didn't want her to get out? A.
No, sir. * * * I wanted to hold her there; I wanted her company
* * * She would have gotten out if she insisted on it. I didn't
hold her. Q. If you had not held her there in the first place,
she would have gotten out? A. I suppose so. Q. How long
did you stay there, holding her? A. I don't remember. Q.
Give us some idea. A. About a minute or so, I suppose. * * *
Q. And then she herself got out? A. Yes, sir. Q. What did
you do when she got out? A. I got out. Q. Why did you get
out? A. Ernie told me to go back and get the other girl.
Q. Why did you want the other girl, when you were trying to
hold Elsie in the car? A. I didn't want the other girl at all
then. Q. When Elsie got out of the car, what did Ernie do?
A. Got out and held her. Q. You saw him holding her? A.
Yes, sir. Q. Why didn't you drive your car after Ida? A. Be-
cause I knew she had not gone far, and I thought I could catch
her. Q. The reason you were going after her, was because you
didn't want her to walk home? A. Yes, sir. * * * Q. Then
why didn't you go after her with the car? A. Because I thought
I could catch her before she got so far.''

The witness here testified that he couldn't see her up the
road, and did not overtake her.

''Q. Ernie was wrestling with that girl, wasn't he? A.
Yes, sir. Q. She was trying to get away from him, wasn't
she? A. I couldn't say as to that. * * * Q. You did
not try to find out what Ernie was trying to do with her, did
you? A. No, sir. Q. You simply left her there to his mercy,
and ran for someone else,—is that what you want this jury to
believe? A. Yes, sir.''

The evidence showed that it was about 678 feet from the
end of the bridge to the residence of Prior; and, if the car was
stopped about 300 feet up the lane, this would make the house
about 978 feet distant from the occurrences of that night. The
Moorehouse residence was about 1,260 feet from the end of the
bridge, and the occupants of each house testified that they heard
no outcry, and two or three others who may have been along the

bridge and in a situation to hear, swore that they heard nothing. Three witnesses say that they had heard Rathbun brag that "he got Elsie's virtue, and that Ray O'Meara got nothing."

Such, in substance, was the evidence introduced, and we have to say that not only was it sufficient to carry the issues as to whether the defendant was guilty, to the jury, but that rarely has the accused been so conclusively shown to have perpetrated the crime charged. The evidence disclosed that neither defendant nor Rathbun had testified at the trial of the latter, who was convicted, and their testimony was sufficient to sustain the verdict, had all other evidence been omitted. As will appear later, the story of Rathbun might have been found sufficiently corroborated by the accused, as that of prosecutrix must have been found to have been sufficiently corroborated by the testimony of Ida Knudsen, on the trial of Rathbun. The jury might have believed the accused, when he swore to driving his automobile into the lane, off the main road, among the trees, and there stopping, where he held prosecutrix as her companion was leaving, and have rejected his story of what followed, as manufactured to shield himself from conviction, though subjecting him to contempt as unreasonable, and unworthy of belief. Undoubtedly, these girls were indiscreet, but they were cautious enough to exact a promise that the automobile should not leave the pavement, and that the ride should end in one half hour; and there was nothing else in their conduct during the evening even to excite suspicion in the minds of the lecherous; and, even if it were otherwise, there was no excuse for the resort to force. The evidence of prosecutrix was sufficient to prove that sexual intercourse was had against her will, but this was confirmed by the testimony of Rathbun. The story of these witnesses was corroborated by the evidence of defendant, in admitting that he restrained the prosecutrix in the seat of the automobile, and left her to the mercy of his criminal associate. These young women, as said, were indiscreet in taking a ride with strangers so late in the evening, or, for that matter, at any time; but there appears to have been nothing in their conduct to encourage either Rathbun or the accused in the belief that they were of loose morals. That the entire occurrence occupied scarcely more than 50 or 55 minutes, might be considered as

having some bearing on the credibility of the witnesses; but automobiles move rapidly, and we are not ready to say that all to which the witnesses testified might not have happened within that time. All these circumstances were for the jury to take into consideration; and, in our opinion, the evidence was ample to sustain the conviction.

II. Counsel for appellant argue that neither the testimony of prosecutrix nor that of Rathbun, the alleged accomplice, is corroborated by evidence tending to connect the accused with the commission of the offense. Whether there was some evidence of this character was for the court to decide; its sufficiency was for the jury. *State v. Crouch,* 130 Iowa 478; *State v. Bricker,* 135 Iowa 343. Evidence is, in its nature, corroborating, if it tends to strengthen and confirm the testimony of the prosecutrix or accomplice in connecting the accused with the commission of the offense charged. *State v. Bricker,* supra; *State v. Norris,* 127 Iowa 683. See, also, *State v. Dorsey,* 154 Iowa 298, where it was said that:

2. RAPE: corrob-
oration: prin-
ciples governing.

"If it be such as to satisfy the jury that the witness spoke the truth in some material part of his testimony in which he is confirmed by unimpeachable evidence, this is sufficient, if it leads to the conclusion that he also spoke the truth as to other matters, for which there was no corroboration."

Again, in *State v. O'Callaghan,* 157 Iowa 545, the court, speaking through Deemer, J., said:

"It is not necessary that the accomplice be corroborated upon every material fact to which he testifies. It is enough if he be so corroborated on some of the material facts as to satisfy the jury that he spoke the truth with reference thereto, and thus induced the belief that his entire testimony is true, although not otherwise corroborated."

Of course, "the material part of this testimony" mentioned in the first case, and "the material facts" in the last, must have been such as tended to connect the accused with the commission of the offense, and the language in each is to be so qualified.

Other decisions might be cited in the same import, but this is unnecessary. The testimony of either prosecutrix or Rathbun might have been found to establish the perpetration of the offense; but corroboration, such as exacted by statute, was essential

to conviction. The testimony of the accused, wherein he admitted having forcibly held prosecutrix in the seat of the automobile, as Ida Knudsen started for home, and swore that the latter had called prosecutrix to come, and that she responded that she couldn't, was corroborative of the story of prosecutrix, as well as of that of Rathbun. So, too, was the testimony of Ida Knudsen, that, when she had left the automobile a short distance, she called prosecutrix to come, and she responded that she couldn't, and immediately afterward uttered ''a heavy, shrill scream.'' The sufficiency of such corroboration to connect the accused with the commission of the offense was for the jury. Ordinarily, mere opportunity is not a corroborative circumstance; but where the opportunity is of defendant's creation, and made with apparent deliberation and design, it may be considered with other circumstances in determining whether the accused is the perpetrator of the offense. *State v. Powers,* 181 Iowa 452; *State v. Lindsay,* 161 Iowa 39; *State v. Crouch,* supra. So, too, proof of flight is corroborative in its nature. *State v. Ralston,* 139 Iowa 44; *State v. Hetland,* 141 Iowa 524, 526. The corroborative evidence, as seen, was abundant, and sufficient to carry the issue to the jury.

III. The testimony of Mary Scheutt and Mrs. Theobald, in substance that, a few minutes after 7 o'clock, the accused and Rathbun, when in Ida Grove, invited them to take a ride, which

**3. RAPE: other offenses or transactions as evidence.** they accepted; and that, when near a schoolhouse about 5 miles out of town, they left the automobile and walked back; and that, when they last saw that vehicle, it was moving toward town, was received in evidence, over objection as being of a separate and independent transaction. The same objection was interposed to the evidence of the Misses Glass and Satterlee, who, when returning from the post office in Ida Grove, at about 8:30 o'clock in the evening, were twice accosted by the accused and Rathbun, and invited to go riding with them. With reference to this evidence, the court told the jury that:

''This testimony was admitted in the case for what it might be worth, in showing the association and whereabouts of the defendant O'Meara and Ernest Rathbun for a short time prior to the time it is claimed this crime was committed; and this

evidence can be used by you alone for that purpose; and for the consideration of all other questions in the case, the evidence of each and all of these witnesses must not be considered by you."

As these incidents occurred within two hours of the time of the offense alleged in the indictment, and apparently during the same trip with the Ford automobile, we are of opinion that the evidence was admissible for the purposes stated in the instruction. As its consideration was so limited, we have no occasion to inquire whether the evidence might not also have been considered as tending to throw light on the bent of the accused's mind, and the purpose of the accused and his companion in inducing the prosecutrix and her companion to ride with them, and carrying them to a more or less secluded place in the lane, among the trees. See *State v. Robinson*, 170 Iowa 267. The instruction has our approval in the respect criticised, and the evidence was rightly admitted.

IV. Counsel contends that there was no evidence of voluntary complaint, and insists that the court erred in the submitting to jury whether she so did. Her mother testified that:

4. RAPE: voluntary complaint by prosecutrix.

"She came to my room crying, and she acted so, and I asked her what had happened; and she said she was out with the boys; and she looked like she had had a scrap with someone. Q. Did she make complaint to you about what the boys had done? A. Yes, sir."

The prosecutrix testified:

"When I got home, I first saw father. I went upstairs to my mother's room, and lit the light, and talked to my mother and told her what had happened."

Manifestly, there was room for a finding that she voluntarily made complaint, immediately on reaching home.

V. After Rathbun had related that he had been convicted of a felony, and what happened during the evening in question, up to the time Miss Scheutt and Mrs. Theobald entered the automobile, counsel for defendant, after alluding to the situation, said to the court:

5. CRIMINAL LAW: witness not excluded because offered inducements.

"I desire to show the circumstances under which he [witness] is here, and to inquire as

to his right to testify in this case, and object to it further as hearsay.''

· No ground was apparent or suggested for then cross-examining the witness, and the court did not abuse its discretion in not permitting such cross-examination until the direct examination had been closed. On cross-examination, it developed, as the witness swore, that one of the State's agents, investigating the charge against the accused, and an attorney then representing the State, suggested to Rathbun, when in Sioux City, that they wished him to make a confession, and said, in substance, that, if he would do so, it would help him; and that, when he applied for a parole, there would be no opposition on their part; and that he would get out of prison quicker, if he made a confession. Later on, the witness testified that all promised was that they would not try to stop the parole; and that he was not asked to tell anything that was not absolutely true; and that he had not done so as a witness. This evidence went to the credibility of the witness, and was proper for the jury to take into account in determining what weight should be given to his evidence; but it furnished no ground for excluding him as a witness, nor for rejecting evidence. Counsel for appellant have confused in their brief the rule allowing these matters to be shown as bearing on the credibility of a witness, with that which excludes proof of admission, and confessions of the accused on trial, when induced by hope or fear. There was no error.

VI. One Hoffman had testified, in chief, to passing a Ford automobile, near the scene of the alleged crime. On cross-examination, he was asked whether he heard any screaming. This was not cross-examination, and an objection on that ground was rightly sustained. The character of the night was not referred to in the direct examination, and excluding a response to the inquiry as to whether it was a "clear, still, bright night" ought not to be denounced as error.

**6. WITNESSES:** cross-examination.

VII. One Sauer was asked, in the course of his examination, ''whether or not you saw Ernest Rathbun and O'Meara in Nebraska, on or about the 21st of November, 1917.'' This was objected to, on the ground that, if ''for the purpose of show-

ing flight, the proper prelimary matters have not been shown,

7. CRIMINAL LAW: competency to testify as to flight. it not appearing that the defendant knew that he was wanted for this or any other offense.'' Such a showing is not essential where the commission of the offense is recent. Such evidence is received as an indication that the accused departed because of his consciousness of guilt, and the probative force of such an inference is its tendency to single out the accused as the person likely to have committed the particular offense. *State v. Hetland,* 141 Iowa 524. As observed in *State v. Robinson,* 170 Iowa 267, where it did not appear that the accused had been charged with the commission of the offense:

''It is a very old saying that 'Conscience does make cowards of us all,' and further, 'The wicked flee when none pursue.' ''

In that case, the court held that the circumstance that the accused had fled was rightly called to the attention of the jury. See, also, *State v. Waltz,* 158 Iowa 191. There was no error in overruling the objection.

VIII.   Complaint is made for that the court did not quote sections of the statute defining rape and each of the included offenses. The jury, however, was told precisely what facts must

8. CRIMINAL LAW: instructions need not quote statute. have been found, in order to convict of each offense. In the second paragraph of the charge, the jury was told the material allegations of the charge of rape; and that, in order to convict, all of these must have been established beyond a reasonable doubt; and that if any were not so established, the accused would be entitled to acquittal. In the eighteenth paragraph of the charge, the jury was told precisely what offenses were included in the charge of rape, and also the elements which must be proven beyond a reasonable doubt, to constitute the crime of assault with the intent to commit rape. In the nineteenth paragraph of the charge, assault and assault and battery were defined, and the jury was informed under what conditions the defendant might be convicted of each of these offenses. True, as contended,

9. CRIMINAL LAW: instructions need not set forth punishment. the jury was not told the penalty consequent on the commission of any of these offenses. With the penalty to be imposed, the jury had no

concern, and might not take the punishment to be inflicted into account, in passing on the issue as to the guilt or innocence of the accused. The duty of fixing the penalty, under law, devolved upon the court alone. It is not necessary to state in the charge the punishment authorized. *State v. Peffers,* 80 Iowa 580; *State v. Woodworth,* 168 Iowa 263; *State v. Wilson,* 157 Iowa 698. Knowledge of the punishment to be imposed for a particular offense could not well aid the jury in determining whether the accused was guilty thereof; but, in a prosecution for murder in the first degree, the jury is to determine whether the punishment shall be life imprisonment or death, and, of course, in such a case as that, that body must be informed of its duty to determine the punishment which shall be meted out, in event of conviction of the offense charged. *State v. Wilson,* supra. The charge clearly advised the jury of the elements included in the crime charged, and what was necessary, under the law, to warrant conviction; and we are of the opinion that there was no error, either in defining the several offenses or in omitting mention of the punishments which might follow conviction.

IX. Exception is taken to the fourteenth instruction, which reads:

"Certain testimony has been admitted before you which 10. CRIMINAL LAW: it is claimed, shows that, after the commission flight and de-    of the crime, the defendant was guilty of flight: fendant's ex-    planation thereof. that is to say, that, shortly after the alleged crime was committed, the defendant could not be found in the community where he usually resided, but had left said community and state. Such testimony, together with the explanation thereof, if any there be in the evidence, may be taken into consideration by you in determining the guilt or innocence of the defendant."

This is criticised, for that his departure from Ida County, as is said, "had been very fully explained, and that his return and submission to arrest refutes the claim of flight."

It may be, as his parents testified, that he threatened to leave home because of his father's refusal to allow him the use of a team for picking corn for a neighbor, in the morning following the transaction in question, and refusal to allow him to

ride to town; and he may have left because of the attitude of
his father. But he might have done so without leaving the state
or county, and it was for the jury to say whether, in leaving
with Rathbun at about noon of the day following the alleged
perpetration of the offense, and gathering corn in the fields of
another state, he left because of what his father had said, or
to avoid arrest and prosecution for the crime he is alleged to
have committed. Nor is the instruction subject to criticism for
telling the jury to take all the testimony, including the explana-
tion, if any, into consideration, in determining the guilt or inno-
cence of the defendant. This was not saying that a finding on
this issue might rest on evidence of flight alone, as seems to be
thought, but that it was for consideration of the jury, in con-
nection with the other evidence adduced. Nor was there error
in requiring the jury to say whether trouble with his father
was explanatory of defendant's departure; for, though the ac-
cused may have left home because of the father's attitude, it
was for the jury to decide whether such attitude also explained
his departure from the community and the state. That upon
his return he voluntarily submitted to arrest is not necessarily
inconsistent with previous flight, though having some bearing
on the cause of his departure. The matters to which counsel
direct attention go to the weight and significance to be accorded
the evidence, but are not persuasive as indicating error in its
reception, or in this instruction with reference to its considera-
tion.

X. Counsel for appellant insist that the county attorney,
in his opening argument, and his assistant, Kindig, in the closing
argument to the jury, were guilty of misconduct. In the course
of his opening argument, the former declared

**11. CRIMINAL LAW:
misconduct in
argument.**
that:

"The act of this young fellow perpetrated
upon that girl has sentenced her throughout her lifetime to
that awful skeleton which will always be in her closet." Later
on, he observed that:

"These girls are only children, and the boys that asked
them to ride, one was 17 and one was 19; and these things are
happening every day in the state of Iowa; and, while it may
be called indiscreet, I do not believe there is one of you that

would censure these girls. The questionable conduct of these boys is up for your consideration in this case.''

The objection to the first statement was that it was improper, and to the last, that the remark was directed specifically to the defendant. We know of no rule which precludes counsel from characterizing the offense charged, and portraying its consequences, or from discussing the evidence in the light of experience, or from directing remarks directly to the accused. What was said did not constitute misconduct, but was within the domain of fair argument.

In the closing argument, Kindig, after alluding to the arguments in behalf of the accused, remarked that:

"I feel and I have the thought and opinion, and I cannot get the thought or idea out of my mind, that it would not have been better for this defendant to have taken the advice of his friend Rathbun, and come up here and plead guilty."

12. CRIMINAL LAW: misconduct in argument.

This was objected to as outside of the record, and it was. The record was without evidence that such advice had been given. There was no ruling. The objection should have been sustained, and counsel admonished. But no prejudice could well have resulted. Rathbun had testified to all the details of the crime alleged, and to his participation therein, and this was stronger than any advice he could have given; and, had he given advice, it must have been that suggested. The misconduct was without prejudice.

Again, the attorney, in referring to the alleged inducements held out to Rathbun, said:

"Let me tell you right here, gentlemen of the jury, that I or the county attorney or the judge of this court or anybody else has anything to say about whether Rathbun will get a pardon or not."

13. CRIMINAL LAW: misconduct in argument.

This was objected to as not being a fair statement of the law; and it was not accurate, for it was broad enough to exclude even the officer having power to grant pardons; but this was followed by a correct exposition of the law relating to such matters, and there was no prejudice. Counsel proceeded:

"He [the defendant] is no more guilty than the man sitting across the table, let me tell you; and, in fairness to fair people

and to fair play, if one of the two gets life, why should not
the other; and I will say this to you, further,
that, so far as I am concerned, if this man is
convicted by you, and he received a life sen-
tence, I will do as much for him as I would do
for Rathbun.''

**14. CRIMINAL LAW:**
**presumption**
**prevailing as to**
**ruling on**
**misconduct.**

This was objected to ''being improper and misconduct on
the part of the attorney for the State,'' and further, that the
record did not disclose ''what he will do.'' The court ruled that
this was ''legitimate response to the argument of the defense.''
The record contains nothing indicative to the contrary. The
ruling is presumed to be correct, and in the absence of any show-
ing to the contrary, must be upheld. Nor can the argument be
denounced as improper, in the light of the evidence adduced.
If defendant were guilty, he was no more nor less guilty than
Rathbun, and entitled to no more nor less consideration; and
counsel said no more.

In further argument, counsel exclaimed:

''Do you have any doubt, gentlemen of the jury, that there
is a much stronger case made here than when they convicted
the other fellow? At the other trial, Rathbun
did not testify. Here he comes clean. He tells
you the whole thing.''

**15. CRIMINAL LAW:**
**misconduct in**
**argument.**

Counsel for defendant objected ''to the remark as improper.
It is not a question of what happened on the other case; it is
a question of what happened in this case.'' The court: ''You
must stay in the record.''

The objection should have been sustained, and the jury
might well have been warned to give no heed to the suggested
comparison. Such an argument is scarcely excusable because
of over-zeal; for every lawyer is aware that a conviction by one
jury is not a legitimate argument for conviction by another,
even on the same evidence. But, on mature reflection, we have
concluded that, in view of the record, the allusion to the other
trial could not well have been prejudicial. The record, as seen,
disclosed that neither Rathbun nor the accused had testified on
the other trial. Their testimony alone would have been suf-
ficient to carry the case at bar to the jury. It is manifest, then,
that, in some respects at least, a stronger case was made out

than against Rathbun when he was convicted, notwithstanding defendant's denial of having individually committed the offense charged. Evidence of what happened at the other trial might have been excluded, but this was not done; and we are of the opinion that directing attention to the fact established by the evidence, that Rathbun's testimony was added to that adduced on the other trial, was not prejudicial to the accused. In view of this conclusion, there is no occasion to review the proceedings under which the record is said to have been corrected. —*Affirmed.*

WEAVER, C. J., GAYNOR and STEVENS, JJ., ·concur.