STATE OF IOWA, Appellee, v. HARLAN LAHMON, Appellant.

No. 45232.

DECEMBER 10, 1940.

OPINION ON REHEARING JANUARY 13, 1942.

John M. Rankin, Attorney General, Jens Grothe, Assistant Attorney General, and Francis J. Kuble, County Attorney, for appellee.

Carl E. Patterson, for appellant.

BLISS, C. J.—On December 10, 1940, this court, by an opinion of that date, reversed the judgment of the trial court. A rehearing was granted on the petition of the State, and on resubmission this opinion affirming the judgment of the trial court is substituted for the aforesaid opinion, appearing in 295 N. W. 148.

Section 13900 of the Iowa Code provides that in a prosecution of this kind, the defendant "cannot be convicted upon the testimony of the person injured, unless she be corroborated by other evidence tending to connect the defendant with the commission of the offense." In the trial court, the defendant contended by motion to direct a verdict in his behalf, submitted at the close of the State's case, and also at the close of all the evidence, and by motion for new trial, that there was no such corroboration as required by the statute. Each motion was rightly overruled, and the jury returned a verdict of guilty. The defendant in this appeal reasserts the contention made below as ground for reversal.

Because the members of the court have not been in entire accord in this appeal, a fuller statement of the facts and the law as they bear upon the question of corroboration seems necessary. The legislative enactment involved is salutary and wise. Men and women are so closely and extensively associated in so many necessary and proper relations in business, social, and other varied activities, that if one accused might be convicted upon the testimony of the complainant alone, injustice might often result. It is true, that it may allow a guilty one to escape, but the scales of justice tip strongly in favor of the rule. But courts, insofar as possible, must direct their earnest efforts that this rule of procedure designed as a protecting shield, shall not be used to camouflage an attack.

The language of the Code section, itself, is the authoritative measure of the required corroboration. Attempted elaboration or clarification of its meaning serves no purpose. It is clear and definite. The "other evidence" need not certainly connect the defendant, nor conclusively point him out as the assailant. It need only *"tend"* to connect him with the commission of the offense, to the end that the jury may say that they have no reasonable doubt of his guilt. State v. French, 96 Iowa 255, 257, 65 N. W. 156. Its tendency must be "such as, when considered with the complainant's testimony," establishes the defendant's guilt. "The statute does not fix the *quantum* or kind of evidence required, nor is its sufficiency to be determined by excluding the evidence of the injured party. State v. McLaughlin, 44 Iowa, [82] 85. If, considered in connection therewith, the

other evidence tends to identify and single out the accused as the perpetrator of the crime, it is of that character contemplated by the statute, and its sufficiency is to be passed upon by the jury." State v. Baker, 106 Iowa 99, 100, 76 N. W. 509, 510. See also State v. Norris, 122 Iowa 154, 155, 97 N. W. 999; State v. Hetland, 141 Iowa 524, 526, 119 N. W. 961, 18 Ann. Cas. 899; State v. Norris, 127 Iowa 683, 684, 104 N. W. 282.

"Evidence is, in its nature, corroborating, if it tends to strengthen and confirm the testimony of the prosecutrix or accomplice in connecting the accused with the commission of the offense charged." State v. O'Meara, 190 Iowa 613, 621, 177 N. W. 563, 568.

In State v. McGhuey, 153 Iowa 308, 314, 133 N. W. 678, 681, this court found no fault with an instruction on corroboration which stated: " 'This does not mean that the state is required to prove the act by direct testimony other than that of the prosecutrix, or by eyewitnesses of the transaction.' " As stated in State v. Greiner, 203 Iowa 248, 250, 212 N. W. 465, and quoted with approval in State v. Teager, 222 Iowa 391, 394, 269 N. W. 348, 349:

"It is the rule in this state that, if there is *any* testimony, independent of that of the prosecuting witness, tending to single out and designate the defendant as the guilty one, its sufficiency is a question of fact for the jury." (Italics ours.)

Speaking through Justice Stiger in State v. Diggins, 227 Iowa 632, 637, 288 N. W. 640, 642, we said:

"It was sufficient if she was corroborated as to some material fact tending to designate defendant as the perpetrator of the offense."

Likewise, in State v. Powers, 181 Iowa 452, 465, 164 N. W. 856, 860, is this language:

"The law prescribes no standard for the strength of corroborating evidence, and there is a failure to corroborate only if there be no evidence legitimately having that effect."

Whether any item of evidence is corroboration, or whether the statutory corroboration, as a whole, is sufficient, is a question of law for the court, but the weight and the probative force of this testimony, as of all other testimony, is a question for the determination of the jury. State v. O'Meara, supra (190 Iowa 613, 621); State v. Teager, supra (222 Iowa 391, 394); State v. Crouch, 130 Iowa 478, 486, 107 N. W. 173; State v. Bricker, 135 Iowa 343, 345, 112 N. W. 645; State v. Norris, supra (127 Iowa 683, 684); State v. Baker, supra (106 Iowa 99, 100); State v. Norris, supra (122 Iowa 154, 155).

Bruises and other physical evidences of an assault upon the person of the victim cannot ordinarily be of any aid in identifying the one who made them, although they confirm and corroborate her statement that the crime was committed. Her prompt complaint of the attack is also not statutory corroboration, but it does corroborate and add to the credibility of her charge that she was ravished. Especially is this true when the complaints are in fact a part of the res gestae. State v. Wheeler, 116 Iowa 212, 213, 89 N. W. 978, 93 Am. St. Rep. 236.

The fact of the commission of the offense may be established solely by the testimony of the one attacked. State v. Beltz, 225 Iowa 155, 279 N. W. 386; State v. Ralston, 139 Iowa 44, 116 N. W. 1058; State v. Speck, 202 Iowa 732, 735, 210 N. W. 913; State v. Mueller, 202 Iowa 1067, 208 N. W. 360; State v. Robinson, 170 Iowa 267, 152 N. W. 590; State v. Wheeler, supra (116 Iowa 212); State v. McLaughlin, supra (44 Iowa 82, 86); State v. Geier, 184 Iowa 874, 877, 167 N. W. 186; State v. Grimm, 212 Iowa 1193, 237 N. W. 451; State v. Christopher, 167 Iowa 109, 111, 149 N. W. 40.

We have many times said that mere opportunity, alone, is not, in itself, sufficient statutory corroboration. See State v. Wheeler, 116 Iowa 212, 89 N. W. 978, 97 Am. St. Rep. 236; State v. Chapman, 88 Iowa 254, 55 N. W. 489; State v. Stowell, 60 Iowa 535, 15 N. W. 417; State v. Lamberti, 200 Iowa 1241, 1243, 206 N. W. 128; State v. Ashurst, 210 Iowa 719, 231 N. W. 319; State v. Brundidge, 204 Iowa 111, 214 N. W. 569; State v. Smith, 194 Iowa 639, 644, 190 N. W. 27. But evidence of opportunity is always admissible, and whether it furnishes the corroboration

required by the statute depends upon the occasion of the opportunity, and all of the preceding and attending circumstances. There are, of course, many occasions and situations in ordinary business and social relations where a man and a woman are together and opportunity for the crime is available, but there is nothing to indicate that the circumstances are other than proper and innocent, or that the opportunity was made for the unlawful purpose. In such situations, we have uniformly held that the opportunity did not furnish the required corroboration. But it is an entirely different matter when the occasion and the facts are other than as just stated, and, instead, it appears from the record that the defendant made or brought about the occasion, and himself furnished and created the opportunity which made the commission of the crime possible. Under such circumstances, we have consistently held that it was a question for the jury whether the corroboration required by the statute had been established. Of such holdings, we said in State v. Smith, supra (194 Iowa 639, 645):

"An examination of our cases recognizing this rule will disclose that in each of them there has been something about the creation of an opportunity and the circumstances attending it that, in and of itself, was suggestive, and sufficient, with other circumstances, to take the case to the jury on the question of corroboration."

In the last cited case, the corroboration was held to be insufficient. This was true also in State v. Powers, 181 Iowa 452, 468, 164 N. W. 856, 861, where the court said: "If, for instance, there were evidence that the opportunity was manufactured under suggestive circumstances, a different case would be present." See the following cases in support of this rule: State v. Kessler, 189 Iowa 567, 569, 571, 178 N. W. 513; State v. Crouch, 130 Iowa 478, 487, 107 N. W. 173; State v. Lindsay, 161 Iowa 39, 44, 140 N. W. 903; State v. McGhuey, 153 Iowa 308, 133 N. W. 678; State v. Waters, 132 Iowa 481, 109 N. W. 1013; State v. Norris, supra (127 Iowa 683, 685); State v. Watson, 81 Iowa 380, 388, 46 N. W. 868; State v. West, 197 Iowa 789, 797, 798, 198 N. W. 103; State v. O'Meara, supra (190 Iowa 613, 622). There was the additional circumstance of defendant's flight in the latter

case. This was also true in State v. Hetland, 141 Iowa 524, 526,. 119 N. W. 961, 18 Ann. Cas. 899, but in that case the alleged offense was in the home of defendant and the complainant was a maid in the home.

But whether the opportunity was or was not created by the defendant, if the opportunity was present, and he was the only person who could have committed the crime, we have uniformly held that the matter of corroboration was for the jury. See State v. Mitchell, 68 Iowa 116, 117, 26 N. W. 44, 45, where the court said:

"But the undisputed evidence shows that if any one had sexual intercourse with the complainant it was Mitchell, and no one else. He testified that he was the one who drove home with complainant, and the one whom her parents saw with her when she arrived."

In State v. Kessler, supra (189 Iowa 567, 568, 569), the court said:

"If the crime was committed by someone, and there was no other person present who could commit it, and it was shown by evidence other than that of the prosecuting witness that defendant was present, and that no one else was, it could not, of course, have been committed by anyone other than such defendant."

In State v. Stevens, 133 Iowa 684, 686, 110 N. W. 1037, is this statement:

"It affirmatively appeared, however, from the testimony of others than the child that the accused was the only person in the house at the time capable of committing the act. This, in connection with the immediate circumstances corroborating her testimony that the crime was committed at that time, was proof of something more than mere opportunity; for, by excluding the possibility of any one else having committed the offense, and confirming the child's story that it was then committed there under the circumstances, tended to single him out as the real perpetrator."

In State v. Teager, supra (222 Iowa 391, 397), speaking through Justice Hamilton, we said:

"Under this state of the record as just related, we are satisfied that the question of corroboration was for the jury, and that if the jury believed—as it had a right to do—the testimony of the prosecuting witness, that she had in fact been assaulted, the facts and circumstances would point to the defendant, *and to no one else as the perpetrator of the offense.*" (Italics supplied.)

To the same effect, see State v. Powers, supra (181 Iowa 452, 468); State v. Lindsay, 161 Iowa 39, 44, 140 N. W. 903; State v. Ralston, 139 Iowa 44, 46, 47, 116 N. W. 1058; State v. Norris, supra (127 Iowa 683, 685).

With these decisions in mind, let us look at the record, as it bears in particular upon the question of corroboration. Unless otherwise indicated, these facts are undisputed. The defendant, age 29 and weighing 160 pounds, is married, and at the time lived beyond No. 5000 on North 6th Avenue in Des Moines, Iowa, a long way and in another direction from 63d and Grand Avenue. The complainant was born January 24, 1919. Her father is dead. She weighed 110 pounds. She entered the girls' training school at Mitchellville, Iowa, in January 1938, and left there on probation to work as a housemaid on September 21, 1939, and had worked in two homes in Des Moines. She was so employed, with a family on 36th Street just off Ingersoll Avenue, on November 9, 1939. That day, being Thursday, she and another maid in the neighborhood took the afternoon off to do some shopping down town. They came home later, and in the evening, about 8:30 o'clock, she and her friend went to the Y. W. C. A. building to attend a meeting of the Amicitia Club, of which both girls were members. A little later, they went to the Tromar dance hall and danced. Her friend left with a gentleman acquaintance about 11:30 o'clock that evening. About the same time, this girl left the dance alone and went over to the Kresge corner at 7th and Walnut to take a streetcar for her home. She had been standing there alone, as she said, for about 15 minutes waiting for a streetcar, when the defendant appeared. His version of the meeting is, in substance, that he drove his automobile north on 7th Street and came around the corner going east and saw this girl and two other girls standing on the

corner. He made the first move, for he testified: "I waved. They waved." He then went east to 6th and Walnut and made a U turn and came back and stopped at Kresge's. Without any invitation, as he testified, this girl got in the front seat and the two girls got in the back seat. He testified:

"One of the girl's name was Bernice. Couldn't tell the other girl's name. I never saw the girls before. I was going to take them home. Started out on Walnut to 15th, went out Grand Avenue to 35th. Turned right on 35th; stopped between Grand and Ingersoll and let Bernice and the other girl out."

Bernice was a witness at the trial and testified:

"I was in Des Moines November 9th, employed on John Lynde Road. I never worked between Grand and Ingersoll on 35th. I left the Tromar about 11:30 with J— W—. I left ahead of G— [the girl in question]. She hadn't gotten her coat. I don't know the exact time she left. I was not at the corner of 7th and Walnut. I haven't seen G— since I left the Tromar. I was not with her. I never seen the defendant. I don't know the man. I didn't get in his automobile."

The prosecutrix's version of what took place at 7th and Walnut is that she saw the automobile pass east on Walnut but paid no attention to it until it came back and stopped in front of her where she was standing on the north side of the street, and the defendant told her that he was going to take her home. She testified: "I told him I didn't care to go home with him. I was waiting for the streetcar. He said I better get in his car, if I knew what was good for me because he had a gun. [He denies this.] I was frightened and got in the car." She testified that she saw no gun. The officers found no gun on him or in his car when they arrested him. He drove west on Walnut Street and over on to Ingersoll Avenue and when he reached 36th and Ingersoll she told him that was where she lived, and he went by and said he would turn around. He testified that he asked her if she wished to take a little ride and she said she did. She denied this. He went west on Ingersoll to Polk Boulevard, and then drove north to University Avenue and west on

that street to 63d Street. During this ride, she testified that she tried to get out of the car and he told her not to try anything funny, and that she opened the door, and he grabbed her arm. She testified that she made an effort to get out of the car many times. He does not deny it. When he reached 63d Street, he turned the car south on that street. He said he did it to take her home. He could have turned the car around and returned to her home on paved, lighted streets. What kind of a street is 63d Street as shown by the record? It is graveled with dirt shoulders. It is lighted for a ways south of University Avenue and then there are no street lights. She testified:

"Where the car stopped there were no street lights. Car stopped on 63d. The car ran into a ditch on the right side of the road. He grabbed me and started kissing me. One hand down my neck and the other one had a tight hold of my arm. We struggled and started fighting. I tried to get away. I tried to push him away and hit him. I bit his hand. Car came from the south. I seen the lights. I tried to open the left hand door of the car. Opened the door and got my head out just as the car went by, and I screamed. It went right on. I was down inside and he was holding me there. I was lying down on my back and he was on top of me. Right hand door was open. My feet were out there. My hips were against the back of the car." The sordid details of his attack as related by her may be omitted other than her statement that he forcibly ravished her three times on the front seat. She testified that after the struggle had continued for some time "He asked me to help him. I wouldn't and he beat me on the forehead, hit me in the eye, right one. Had a mark on the left side of my face. From then on, I just gave up fighting. I was weak. I lost my strength. I fought until I didn't have any strength left. I have no opinion how long I was there. Then he pulled my coat down, of course my clothes were up. He tore my bloomers. He didn't take them off."

At no place in the record does the defendant deny this testimony, or expressly say it is not true except that he says that he never had "any hand on her head or throat." What-

ever inferential denial, if any there be, must be found in his story, as follows:

"There isn't any street lights half way down on 63d. There is no houses where I got stuck. This was around 1:15 to 1:30 in the morning. I never had in my mind to have intercourse with the girl. She wanted to go to the tourist camp and suggested it. She didn't say go for a ride. She loved me. I kept my hands on the wheel. She kissed me. After she kissed me, I kissed her. She didn't say anything about she loved me. She opened my clothes up the front of my pants. I put it away. I got from underneath the wheel. When I got stuck we had the argument about going to a cabin camp. She asked me if I would go to a tourist camp. I said no, I couldn't go. I had only 60c. Stayed in the car, and she wanted me to go to a tourist camp. She says you take me home you son of a bitch. She slapped me and at that time I was mad and after she slapped me I slapped her back. I probably slapped her on the right eye. She called me a son of a bitch. She didn't hurt me. She reached down and unbuttoned my pants. I pushed her hands away and buttoned my pants up. She did it just once."

His own testimony fully satisfies the law with respect to the necessary corroboration, but there is other testimony corroborating the testimony of the girl. Whether the car inadvertently slipped off the gravel and the soft shoulder, or sunk in the soft mud when he drove to the side of the gravel to stop was a question for the jury. The car did not upset but slanted somewhat to the right and west. Whichever it was, it is undisputed that he immediately directed his attention and his energies, not to the car, but to the girl. When he had finished with her, he began racing the motor of the car to drive ahead, but the right wheels were stuck in the mud. He then took the girl with him to a service station a short distance south, to get help to get his car out. The station was closed and he stopped a car coming south by waving a flash light. This car was driven by Kenneth W. Wooliscroft of Canonsburg, Pennsylvania, who was then a member of the senior class in the Still School of Osteopathy at Des Moines. With him was his room, and class, mate, Jess S. Varner, of Ocala, Florida. When the defendant

stopped them, Kenneth told Jess to roll up the window and lock the door. He hadn't seen the girl. He testified:

"I heard someone rap on the window on the left hand side. She motioned for me to roll the window down. I looked up and she appeared to be crying. She said she had been kidnapped. She just whispered. I suggested to my roommate that we take this girl to town and send someone back to pull the car out of the ditch. I told him I couldn't help him. She jumped on the running board and I put the car in low and started off. I turned east on Grand Avenue and went approximately four blocks. I stopped the car then and let her in. She got in on the right hand side and sat next to the window. She seemed quite hysterical and was crying. She said he had made her. That was the term she used. She asked me if I would come into the house and explain to the people what had happened, where she lived. So Jess and I got out and went to the house. * * * She was holding on to the side of the car with her fingers on the inside of the window. She was shaking terribly. Her face was puffed."

Varner testified:

"It was after midnight. Around one o'clock. She appeared at the window at the left and talked to the driver, Kenneth Wooliscroft. I didn't hear her say anything. Ken said the girl was being kidnapped. Ken told her to hang on to the side. She did. We then went up the street as fast as we could. * * * She cried when she was on the inside of the car. She was rather hysterical. We told her to take it easy and we kept on going. She said the fellow had kidnapped her and beaten her up. Her hair was mussed up. She was crying and her eyes were red. She said he choked her. I never knew Lahmon prior to that time. Never saw defendant before."

Vane B. Overturff, the sheriff, testified that in the early morning of November 10th he and two officers went to the girl's home and she told them that she was kidnapped at 7th and Walnut and taken to 63d Street north of Grand:

"Said his car was in the ditch. She was very nervous. * * * Went immediately to 63d and Grand. Lahmon was at the scene where his car was in the ditch. We pulled along side and put him under arrest. He said what is this all about. We told him we were arresting him and took him down to jail for investigation. We didn't question him at all. Mr. Lyons and I took the car down and found a pair of ladies' gloves and a hair ribbon. He told us he would rather talk to his attorney before anything was done. We gave him the privilege. He never at any time said what happened out there. * * * We called him to the office and talked to him a few minutes and he informed us he would rather talk to his attorney before we questioned him. * * * The car was off the gravel part of the road sitting in a slanting position." The hair ribbon and gloves belonged to the girl. Defendant testified: "I seen the hair ribbon and gloves. I didn't take them off her."

The testimony of Dr. Klocksien, who examined her on the morning of November 10th, was:

"There was a superficial abrasion about twelve centimeters [a centimeter is two-fifths of an inch] long on the left side of her face. * * * I found a superficial abrasion over the left hand anterior ilium spine on the left side of the pelvic bone. Also there was somewhat superficial abrasion about two centimeters on the medial and left side. There was blood on the same area. There was blood around the sexual organs. * * * I examined the vagina which contained a small amount of old blood and a small amount of fresh bright red blood."

Fred Hird, the chief deputy in the sheriff's office, saw the girl on the morning of the 10th. He testified:

"I saw a long mark on the left side of her face about three-eighths of an inch in width and it extended from a point below her left ear and run over here over her eye and came forward and terminated in the vicinity of the edge of the left eye. Also another mark on her cheek that was horizontal and was extended back over her jaw, forward to the left part of her face. That is the lower end we have. The first mark would be around

six or seven inches and the shorter mark about four inches. Her eye was bruised and swollen, the swelling just at a point on the cheek down below the right eye. It was also swollen to the right eye.''

Marion Hirschberg, deputy sheriff, and Lyons, another officer, went with the sheriff and were present when the defendant was found where his car was in the ditch. The former testified that the place was in Polk County, and that he saw the gloves in the car.

Extended argument in support of the State's contention, in the light of this record, is unnecessary. The defendant's own testimony is ample corroboration. In addition, there is the testimony of Wooliscroft, Varner, Overturff, and Hirschberg. The defendant created the opportunity and the evidence clearly shows that he had a preconceived ulterior and wrongful purpose in everything that he did. Why should a married man turn his car from its course at midnight on seeing a lone girl standing on the corner waiting for a streetcar, a girl who was an utter stranger to him, and take her in his car thirty blocks past her home to an unlighted, sparsely built-up side road, where he admits an argument and a struggle took place, and that he hit her in the right eye? He admits a physical assault upon her and they are seen together near the place of the assault, with her crying and hysterical, her underwear torn, her face scratched and bruised, her right eye and cheek swollen, and her body with blood-marked abrasions upon it as though a ravishing attack had been made upon her. This wasn't a boy and girl ''petting party''. She states that she was ravished. Whatever assault was made upon her was made by the defendant. He was the only one with her and the only one who had an opportunity to do so. This is true by his own testimony. Whether he ravished her was for the jury to say, and they found that he had. The only question for this court to decide is whether there was evidence other than the girl's testimony tending to connect the defendant with the commission of the offense. To say that there is not sufficient corroboration, is to fly in the face of the statute, the decisions of this court, and common sense. If there was sufficient corroboration, then the judgment of the lower court should be af-

firmed, unless we are to trespass upon the functions of the jury and override its verdict, and believe the story of the defendant that this housemaid, trying to live honestly and decently, albeit she had been an inmate of a training school, took this night-riding defendant out on a lonely side street and after unsuccessfully trying to seduce him, called him a vile name, slapped him in disgust and told him to take her back to town. His fabricated story was beyond the credulity of the jury.

The trial court rightly found that the issue of statutory corroboration was for the jury. The jury found with the State on every issue. Both saw and heard all of the witnesses. To reverse this case would be to trespass upon their functions.

One may search the reports of this court in vain to find a reversal in a rape case where the corroboration is of the strong definite character that it is in this case. Here we have the two young men from Still College who came upon the complainant and the defendant, just shortly after the assault. She was crying, trembling, nervous, hysterical, her hair disheveled, her face puffed and swollen, and her eyes red as from crying. She concealed herself from the defendant on the other side of the car and whispered to the driver to take her away. She told them of the assault. It was so shortly thereafter, and her condition was such, that it may be considered independent evidence and part of the res gestae. This does not make it statutory corroboration, but it strengthens and confirms all of her testimony. If we should hold that the testimony of these two students was not the required corroboration, then this court was in error, when it said the testimony of the girl's father in State v. Dudley, 147 Iowa 645, on page 651, 126 N. W. 812, was corroboration. In a case where the two witnesses were a little closer to the assault, this court held that their testimony respecting the condition, actions, and appearance of a girl, very similar to that of this complainant, was sufficient corroboration. See State v. Mueller, 202 Iowa 1067, on page 1070, 208 N. W. 360. In numerous cases which have come before this court, the defendant was not seen at the place of the alleged crime, or was seen at a distance and much later, or he was not seen at all, and yet this court held there was statutory corroboration. But here the de-

fendant admits his presence with the complainant at all times from the time he took her in his car at 7th and Walnut, until she escaped with the two students at Grand Avenue and 63d Street two or more hours later.

The facts are always different in every such case, but, in the following cases, the corroboration was much weaker than in this case but we held it was corroboration as defined in the statute: See State v. Vochoski, 170 Iowa 246, 250, 150 N. W. 53; State v. Hogan, 145 Iowa 352, 355, 124 N. W. 178; State v. McIntyre, 203 Iowa 451, 452, 453, 212 N. W. 757; State v. McCausland, 137 Iowa 354, 357, 113 N. W. 852; State v. Baker, 106 Iowa 99, 101, 76 N. W. 509; State v. Taylor, 196 Iowa 1015, 192 N. W. 294; State v. Grimm, 212 Iowa 1193, 237 N. W. 451; State v. Mitchell, supra (68 Iowa 116, 118).

We have considered all errors assigned, and find all of them to be without merit.

The judgment is affirmed.—Affirmed.

STIGER, HALE, GARFIELD, and WENNERSTRUM, JJ., concur.

MITCHELL and MILLER, JJ., dissent.