STATE of Iowa, Appellee,

v.

Marion Archer KING, Appellant.

No. 59140.

Supreme Court of Iowa.

June 29, 1977.

Lawrence F. Scalise, of Scalise, Scism, Gentry, Brick & Brick, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., Jim P. Robbins, Asst. Atty. Gen., Ray A. Fenton, County Atty., Donald F. Starr, Asst. County Atty., for appellee.

RAWLINGS, Justice.

Defendant, Marion Archer King, appeals from judgment on jury verdict finding him guilty of first degree murder in violation of Section 690.2, The Code 1975. We affirm.

September 8, 1975, this cause came on for joint trial with *State v. Billy Joe Armento Houston* in Polk District Court.

Prior to commencement of trial King (defendant) moved to suppress all evidence seized from his New Mexico residence pursuant to a search warrant issued in that state. He also filed a pretrial motion to disqualify Assistant County Attorney Donald Starr. These motions were overruled and trial ensued.

During trial, and again at close of all evidence, defendant's directed verdict motions were overruled. In addition, his mistrial motion made after Robert Laden had testified was denied.

Following return of the verdict, defendant unsuccessfully moved for a new trial. Upon being sentenced to the penitentiary for life defendant initiated this appeal.

In course of trial the State produced testimony showing Billy Joe Armento Houston (Armento) and Lawrence Paul Kocher (Kocher) flew to Des Moines March 4, 1975, rented a red Vega from Dollar-A-Day Rent-A-Car Company, and checked into room 124 at the Midtown Motor Inn. While in Des Moines, Kocher used the name Larry Myestas.

According to Kocher, defendant came to the motel March 11 to discuss a plan for murdering his wife. Kocher testified defendant directed them to park their car on North Valley Drive in Des Moines the next evening and flag down his car; defendant would stop to help; Armento was to then kill Mrs. King and shoot defendant in the leg. Kocher testified the plan was executed March 12 as directed.

In support of Kocher's testimony, the State produced witnesses who verified the fact Armento had rented a red Vega and checked into the Midtown Motor Inn March 4, accompanied by Lawrence Kocher. The red Vega was returned to the rental agency March 12 at 7:29 p. m., less than one hour after occurrence of the alleged killing.

The State also introduced evidence disclosing at least two phone calls had been made from Armento's motel room to the Hotel Plaza in Albuquerque, New Mexico, King's place of employment. Defendant's secretary testified she received two phone calls between March 5 and March 17 from a man who identified himself as Larry Myestas and wanted to speak with Mr. King.

Additionally, the State adduced testimony revealing King had withdrawn a total of about $3500 from various savings accounts since January 27, 1975. A Des Moines policeman who investigated the crime further testified defendant told him he had withdrawn $400 from a bank in Des Moines on March 12.

John Andrews, Mrs. King's brother, a State's witness, said he had lunch with King March 12, and during their conversation defendant mentioned he had estate tax problems "beat" because he and his wife both had insurance on each other. Andrews noted, however, defendant did not initiate the conversation about taxes.

Lieutenant Clarence Jobe of the Des Moines Police Department, also a prosecution witness, identified State's Exhibit 60 as an insurance policy in defendant's name

covering Mrs. King. The policy, originally providing $100,000 coverage, had been increased in 1974 to a total of $200,000. Defendant objected to the admission of this evidence.

King testified in his own behalf. He stated he was taking his wife to the Pier Restaurant for dinner the evening of March 12, when flagged down by two men apparently stranded on North Valley Drive. Defendant said he and his wife decided he should try to help the two men start their car. While checking under the hood of the car, defendant yelled to his wife for a screwdriver. One of the men went to defendant's car, ostensibly to obtain the screwdriver, while defendant remained at the other vehicle working on the engine. Defendant testified he then heard what was first thought to be a car backfiring, but soon realized it was gun fire. King said he started running back to his car, "wondering about the $400 I had placed under the floor mat", and was thereupon confronted by the alleged assailant who "pushed me violently in the chest" then "shot me in the leg". Defendant said he returned to his car and drove Mrs. King back to her sister's home for aid.

King also stated he first described the two assailants as white males, but later realized one "had Negroid features and appeared to be darker than I remembered". King also testified Lawrence Kocher was the other man on North Valley Drive that night.

Defendant further related he had understood the $200,000 insurance policy on his wife was payable only for accidents. He stated her coverage was increased because she would receive 55 per cent of his Air Force pension at his death.

With regard to recent withdrawals from savings accounts, defendant said he took out $1000 in early 1975 to apply on a mortgage outstanding on his Albuquerque home. He said $2500 had been removed from a New Mexico account to pay off gambling debts; $400 was withdrawn the day of the murder, apparently to cover expenses incurred during his trip to Des Moines.

Finally, defendant testified he received no phone calls from Billy Armento, Lawrence Kocher, or Larry Myestas. King denied having ever met any of these people or that he had planned to have his wife killed.

Other facts will be considered as they relate to our consideration of the issues here raised.

In support of a reversal defendant asserts trial court erred in:

(1) Denying his motion for a new trial due to judicial misconduct;

(2) Denying his motion to suppress evidence seized from his New Mexico home pursuant to a search warrant there issued;

(3) Failing to submit for jury consideration his requested accomplice-corroboration instruction;

(4) Sustaining the State's motion under Section 780.11, The Code 1975, to allow testimony by additional witnesses on behalf of the State;

(5) Depriving defendant of his right to a fair trial by precluding introduction of evidence regarding Lawrence Kocher's State-induced testimony.

These assigned errors will not be entertained in the order presented.

I. At the outset, King maintains trial court erroneously overruled a motion to suppress evidence seized from his home in New Mexico pursuant to a search warrant there issued. Defendant asserts evidence obtained under a prior allegedly defective Iowa search warrant was utilized in order to secure the New Mexico warrant. He argues the subsequent warrant was invalid because remaining allegations in the supportive affidavit were purportedly insufficient to constitute probable cause.

Admittedly, defendant's trial court brief alludes to New Mexico law in the search and seizure field, more particularly probable cause for issuance of a warrant. But this falls far short of requisite pleading and proof as to such foreign law. Therefore, the judicial notice precept does not come into play. Rather, absent requisite

pleading and proof, it will be presumed relevant New Mexico law is the same as that which obtains in this jurisdiction. *Matter of Estate of Allen,* 239 N.W.2d 163, 168–169 (Iowa 1976); *Farmers Insurance Group v. Merryweather,* 214 N.W.2d 184, 189 (Iowa 1974).

In keeping therewith we initially note our summarization in *State v. Sheridan,* 247 N.W.2d 232, 234–235 (Iowa 1976):

"This court in *State v. Spier,* Iowa, 173 N.W.2d 854, discussed and analyzed at length the duty of a magistrate in considering and determining probable cause for issuance of a search warrant. The pertinent quotations from pages 858–859 of Spier are:

" 'Amendment 4 of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, *but upon probable cause,* supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (Emphasis supplied).

" 'To the same effect is section 8, Article I, of the Iowa Constitution.

" 'It therefore follows a search warrant may issue only upon an adequate showing, under oath or affirmation, of probable cause.

" 'Touching on that subject the court said in *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879: "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved."

" 'This was later repeated, with approval, in *Beck v. State of Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 226, 13 L.Ed.2d 142.

" 'Unquestionably a *warrant-issuing magistrate,* in determining the matter of probable cause, *must judge for himself the persuasiveness of facts relied on by an applicant,* mere conclusions being totally inadequate. *Giordenello v. United States,* 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503.

" 'Thus, a magistrate is required to make an objective determination of the factual situation presented to him on oath or affirmation, mere subjective findings or conclusions of an applicant-officer being insufficient and of no probative value. See *Beck v. Ohio,* supra, at 379 U.S. 97, 85 S.Ct. 229.'

"More recently in *State v. Boer,* Iowa, 224 N.W.2d 217, 219, 220, we said:

" 'Probable cause for issuance of a search warrant exists only when the facts and circumstances presented to the judicial officer are sufficient in themselves to justify the belief of a man of reasonable caution that an offense has been or is being committed. *State v. Everett,* 214 N.W.2d 214, 217 (Iowa 1974). It cannot be established unless the issuing officer has sufficient facts, as opposed to mere conclusions, to make his own determination that it exists. *State v. Lynch,* 197 N.W.2d 186, 191–192 (Iowa 1972); *State v. Salazar,* 174 N.W.2d 453 (Iowa 1970); *State v. Spier,* 173 N.W.2d 854 (Iowa 1970); see *Giordenello v. United States,* 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503, 1509 (1958) ("The [magistrate] must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause.").'

"See also *State v. Wright,* Iowa, 244 N.W.2d 319; *State v. Rockhold,* Iowa, 243 N.W.2d 846; *State v. Nelson,* Iowa, 234 N.W.2d 368; *State v. Drake,* Iowa, 224 N.W.2d 476."

See also *State v. Moehlis,* 250 N.W.2d 42, 45 (Iowa 1977); *State v. Wright,* 244 N.W.2d 319, 320–321 (Iowa 1976); *State v. Easter,* 241 N.W.2d 885, 886–887 (Iowa 1976); *State v. Birkestrand,* 239 N.W.2d 353, 356–357 (Iowa 1976); *State v. Boyd,* 224 N.W.2d 609, 614–616 (Iowa 1974).

Mindful of the foregoing, we look now to the record. It reveals that on March 12, 1975, Des Moines Police Detective Clarence Jobe was advised by John Andrews, Anne King's brother, defendant had said, the day of the killing, he recently took out additional life insurance on his wife. Two days later, the police found an insurance policy, face sum $109,000, on the life of Mrs. King in a Des Moines bank safe deposit box. This policy was seized pursuant to a search warrant issued in Des Moines. At trial the State, for some unknown reason, stipulated this warrant was invalid due to a defect in the post-seizure notice required by Code §§ 751.17–751.18.

March 17, Detective Jobe went to Albuquerque for the purpose of there effecting a warrant-based search of defendant's residence. An affidavit prepared by Jobe was initially found insufficient to establish requisite probable cause. This original affidavit included information to the effect defendant and Mr. Armento had the same telephone number in their possession; defendant withdrew $400 in cash in $20 bills from a Des Moines bank on the day of the murder; and the insurance policy had been increased.

The affidavit was then amplified. As amended it additionally stated, (1) Armento had a large amount of money in his possession while in Des Moines; (2) there were some errors in defendant's version of the subject killing; and (3) Armento left Des Moines the day of the shooting. Detective Jobe stated they also supportively alerted the issuing magistrate as to certain inconsistencies in defendant's account of his activities the day before the murder.

It is not apparent from the record when evidence concerning the insurance policy itself was brought to the attention of the New Mexico magistrate. Nevertheless, a warrant issued for search of defendant's residence. The insurance policy and rider thereby seized were admitted in evidence.

Defendant contends information concerning the insurance policy obtained pursuant to the aforesaid Iowa defective warrant, noted in the New Mexico affidavit, was necessary to a finding of probable cause to search his home, therefore the latter warrant was constitutionally invalid. He relies on our recent decision, *State v. Swartz,* 244 N.W.2d 553, 555 (Iowa 1976), where we said:

"Principles applicable to determining the legality of the search of defendant's residence are reviewed in *State v. Hagen,* 258 Iowa 196, 205, 137 N.W.2d 895, 900 (1965). A search is good or bad when it starts and does not change character from its success. It is not justified by what it turns up. *State v. McManus,* 243 N.W.2d 575 (Iowa, filed June 30, 1976). Moreover, an unlawful search taints all evidence obtained in the search or through leads uncovered by the search. See *Wong Sun v. United States,* 371 U.S. 471, 484–485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453–454 (1963).

"Here the first search warrant issued without probable cause. The search of the package at the post office was therefore unlawful. Information from that search was used to obtain the second warrant. This tainted the second warrant and made the search of defendant's home unlawful."

In order to effectively evaluate defendant's position under the present facts an understanding is essential as to policies underlying the exclusionary rule. See *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

The United States Supreme Court has recently stated it was a judicially created means of effectuating Fourth Amendment protections against unreasonable searches and seizures. *Stone v. Powell,* 428 U.S. 465, 482, 96 S.Ct. 3037, 3046, 49 L.Ed.2d 1067 (1976). The rule has also been said to rest primarily upon its purported tendency to deter police misconduct. *Stone v. Powell, supra,* 96 S.Ct. at 3048; *United States v. Janis,* 428 U.S. 433, 445, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976); Comment, "The Supreme Court, 1967 Term", 82 Harv.L. Rev. 63, 221–222 (1968); Kamisar, LaFave & Israel, Modern Criminal Procedure, ch. 11, at 706 (4th ed. 1974).

As with any remedial concept, however, application thereof has been restricted to those areas where its therapeutic objectives are thought most efficaciously served. *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974).

But nothing in the record demonstrates the Des Moines warrant issued other than upon requisite probable cause for the search of defendant's safe deposit box. Moreover, both counsel merely stipulated there was a lack of the statutorily required post-event notice specified in Code §§ 751.17–751.18. It therefore follows the involved relatively minor technical irregularities occurred only after the questioned Des Moines seizure. Hence we look to *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), where the effect of a similar procedural flaw in execution of a search warrant was considered. There a Wisconsin police officer failed to list in the return on an exercised warrant a seized sock and automobile floor mat. In rejecting a contention that the defective return vitiated the underlying search the court said:

> "The seizures of the sock and the floor mat occurred while a valid warrant was outstanding, and thus could not be considered unconstitutional * * *. As these items were constitutionally seized, we do not deem it constitutionally significant that they were not listed in the return of the warrant." 413 U.S. at 449, 93 S.Ct. at 2532, 37 L.Ed.2d at 719.

In like vein we have held procedures required for the return of a search warrant are ministerial and, absent a showing of prejudice, attendant irregularities will not serve to void an otherwise valid search. *State v. Hall,* 235 N.W.2d 702, 718 (Iowa 1975); *State v. Kramer,* 231 N.W.2d 874, 878 (Iowa 1975); *State v. Kaufman,* 201 N.W.2d 722, 724 (Iowa 1972); *State v. Wenks,* 200 Iowa 669, 670–671, 202 N.W. 753 (1925). See also *State v. Mollberg,* 246 N.W.2d 463, 469–470 (Minn.1976); *United States v. Hall,* 505 F.2d 961 (3d Cir. 1974); *United States v. Kennedy,* 457 F.2d 63, 67 (10th Cir. 1972), cert. den., 409 U.S. 864, 93 S.Ct. 157, 34 L.Ed.2d 112 (1972); 68 Am. Jur.2d, Searches and Seizures, § 83.

■ In the absence of a showing that the Des Moines search was for some reason "otherwise" invalid, the stipulated defects were not, per se, so prejudicial to defendant as to provide a basis for excluding evidence thereby obtained. Conceding deterrence is the major purpose to be served by the *Mapp* rule, there appears no evidence of any culpability on the part of officers involved which justifies its present application. In other words, the suppression of evidence here contested would have no deterrent effect upon improper police activity. Accordingly, the New Mexico court was fully justified in considering the $109,000 insurance policy in determining whether probable cause existed for issuance of a warrant to search defendant's residence in that jurisdiction.

■ Additionally, if the contested showing were to be excised from the second affidavit, there existed sufficient facts, independently obtained, which supplied probable cause for issuance of the warrant. *State v. Iowa Dist. Ct. in and for Johnson Cty.,* 247 N.W.2d 241, 247 (Iowa 1976). See also *Mills v. State,* 278 Md. 262, 363 A.2d 491, 498 (1976); *Commonwealth v. Gullett,* 459 Pa. 431, 329 A.2d 513, 515 (1974); *United States v. Watts,* 540 F.2d 1093, 1095, n. 2 (D.C.Cir.1976); *United States v. Crumpler,* 536 F.2d 1063, 1064 (5th Cir. 1976); *United States v. Koonce,* 485 F.2d 374, 379 (8th Cir. 1973); *United States v. Lucarz,* 430 F.2d 1051, 1054 (9th Cir. 1970); *Howell v. Cupp,* 427 F.2d 36, 38 (9th Cir. 1970); *United States v. Sterling,* 369 F.2d 799, 802 (3rd Cir. 1966); *Chin Kay v. United States,* 311 F.2d 317, 321 (9th Cir. 1962); *Clay v. United States,* 246 F.2d 298, 304 (5th Cir. 1957), cert. den., 355 U.S. 863, 78 S.Ct. 96, 2 L.Ed.2d 69 (1957).

More specifically, the record reveals the New Mexico warrant was supported by an affidavit stating: a gun was found near the crime scene of the same type as that used by the Air Force in World War II and defendant is a retired Air Force officer who then served; defendant was with his wife when she was murdered, thus an eyewitness

to the crime; defendant stated he was shot in the leg from a distance of three to five feet although ballistics tests indicated he was shot from a much closer range; defendant withdrew $1000 from a local bank and by way of explanation had said he was going to apply same to a mortgage on his home; defendant also withdrew $400 in $20 bills from a Des Moines bank; Billy Joe Armento rented a room at the Des Moines Midtown Motor Inn March 4, 1975, had deposited $840 in $20 bills March 11, 1975, and $250 March 12, 1975, in the motel safe; a phone call from a room rented to Mr. Armento was made to a hotel which employed defendant; Armento returned a rented red Vega approximately 20 minutes after Mrs. King's murder and left with Larry Myestas later that evening on a one-way flight to Denver, defendant had described the "suspect" automobile as being "dark red" colored; police had a conversation with John Andrews, Mrs. King's brother, who told them defendant had "informed him that he had purchased some insurance on Anne Margaret King and questioned Mr. Andrews relative to inheritance tax payable on the proceeds of a life insurance policy".

It is to us evident that even without the evidence concerning the $109,000 Iowa located insurance policy, the New Mexico affidavit sufficed to establish probable cause. As aptly observed by trial court, there was sufficient evidence (John Andrews' statement about recent changes in defendant's insurance policies) to support a finding of probable cause, not created as a result of an unlawful search and seizure, therefore eliminating "fruit of the poisonous tree". *Wong Sun v. United States*, 371 U.S. 471, 487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). See also *Costello v. United States*, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Co., Inc. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *United States v. Kennedy*, 457 F.2d at 66; *United States v. Griffin*, 413 F.Supp. 178, 183 (E.D.Mich.1976).

Admittedly, some of the above recited information was hearsay. Even so, this court has held hearsay, even double or triple hearsay, may be sufficient for probable cause without extrinsic corroboration. *State v. Birkestrand*, 239 N.W.2d at 358. See also *United States v. Harper*, 550 F.2d 610, 615 (10th Cir. 1977).

Finally, as aforesaid, the noted procedural defect which attended the Des Moines search warrant was not of such constitutional dimension as to preclude consideration of the insurance policy obtained pursuant thereto in connection with the subsequent New Mexico proceedings. Upon our de novo review of the record (*State v. Iowa Dist. Ct. in and for Johnson Cty.*, 247 N.W.2d at 245) we conclude the use of this evidence was in any event essentially harmless due to inclusion of other competent evidence sufficient to constitute probable cause. In brief, King failed to prove the seizure effected under the New Mexico warrant was illegal. *State v. Birkestrand*, 239 N.W.2d at 357. Defendant's motion to suppress evidential use of the insurance policy was properly overruled.

II. Next entertained is King's claim to the effect trial court committed reversible error by granting the State's motion for leave to call additional witnesses. See Code § 780.11. The request was made when, upon voir dire of a Northwestern Bell Telephone representative, testifying for the State, the witness admitted microfilm business records in his possession were not originals and he was not the company custodian thereof. Trial court sustained objections by defendant going to competency of the witness to testify and absence of best evidence.

The State then moved, upon the basis of a supportive affidavit, for leave to present additional testimony by two other named Northwestern Bell representatives having custody of the originals. Defendant objected on the ground the State had not been diligent in obtaining the evidence sought to be introduced and more than reasonable time to ascertain custodial rights as to the required records had elapsed. Trial court sustained the State's motion, finding the prosecution had every reason to rely on the

first witness' grand jury testimony stating he was the record custodian. Defendant did not request a continuance, although granted a standing objection to any testimony by the two additional witnesses.

Defendant now contends the court below erred in sustaining said motion because the movant had failed to show there was insufficient time to learn the evidence could be obtained prior to trial and failed to show it was diligent in ascertaining the availability of the evidence sought to be introduced. We cannot agree.

■ When an in-course-of-trial prosecution motion is made for leave to call additional witnesses and defendant does not request a continuance, as is his right under Code § 780.12, he waives any timeliness of notice objection. As articulated in *State v. Sevcik*, 239 N.W.2d 571, 573 (Iowa 1976):

"Although we are not insensitive to the preservation of error dilemma in which defendant found himself, it is evident he overlooks the salutary purpose of the four day notice rule, i. e., 'to inform defendant of the witnesses against him and the substance of their testimony.' See *State v. Bruno*, 204 N.W.2d 879, 886 (Iowa 1973).

"Actually, *Sevcik* appears to interpret § 780.10 et seq. as an *exclusionary* mechanism. But these statutes do not prohibit the introduction of evidence under all circumstances. Rather, they procedurally relate to *timely* evidential notice. If the accused has no objection as to timeliness, all reason for preclusion falls."

See also *State v. Givens*, 248 N.W.2d 86, 88 (Iowa 1976); *State v. Gilliland*, 252 Iowa 664, 670, 108 N.W.2d 74 (1961); *State v. Kidd*, 89 Iowa 54, 60–61, 56 N.W. 263 (1893).

III. King also postulates trial court erroneously refused to submit his requested accomplice-corroboration instruction. He first generally objected to trial court's proposed instruction, then requested the following be added thereto: "[T]he State must establish the existence of the corroborative evidence as defined in these instructions beyond a reasonable doubt." Trial court refused to include this proposal. But defendant took no attendant exception.

Trial court then gave this instruction:

"The witness Lawrence Paul Kocher has given evidence showing his connection with the commission of the alleged offense for which defendants King and Armento are on trial, and, therefore, under his testimony he is an accomplice.

"The term 'accomplice' refers to and includes all persons who participate in the crime with which the defendants are charged; that is, all persons who knowingly and voluntarily cooperate or aid and abet in its commission.

"Under the law of this State, a defendant cannot be convicted of a public offense upon the evidence of an accomplice unless his testimony is corroborated by other evidence which shall tend to connect the defendant with the commission of the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense or circumstances thereof. The corroboration may be by either direct or circumstantial evidence.

"A defendant cannot be convicted of the offense or offenses charged against him upon the testimony of such accomplice alone unless there is other evidence tending to connect the defendant with the commission of the offense charged, and such other evidence, if any, is not sufficient if it merely shows that the offense was committed or the circumstances thereof, but it must be such as tends to point and single out the defendant as one of the persons who committed it."

It is at once apparent the foregoing comports with previously stated applicable law. See *State v. Lain*, 246 N.W.2d 238, 241 (Iowa 1976); *State v. Vesey*, 241 N.W.2d 888, 890 (Iowa 1976); *State v. Jochims*, 241 N.W.2d 25, 27 (Iowa 1976). See also Code § 782.5.

Furthermore, this court has held that where a defendant voices no exception to denial of a requested instruction, there is nothing for this court to review. *State v. Fowler*, 248 N.W.2d 511, 518 (Iowa 1976);

*State v. Still*, 244 N.W.2d 805, 807 (Iowa 1976); *State v. Jochims*, 241 N.W.2d at 27–28; *State v. Kramer*, 231 N.W.2d at 877; *State v. Feddersen*, 230 N.W.2d 510, 516 (Iowa 1975); *State v. Blyth*, 226 N.W.2d 250, 273 (Iowa 1975); *State v. Dahlstrom*, 224 N.W.2d 443, 450 (Iowa 1974); *State v. Overmann*, 220 N.W.2d 914, 918 (Iowa 1974). See generally *Rush v. Sioux City*, 240 N.W.2d 431, 441 (Iowa 1976); *Wong v. Waterloo Community School District*, 232 N.W.2d 865, 868 (Iowa 1975); Sullins, "Preservation of Error: Providing a Basis for Appellate Review", 22 Drake L.Rev. 435, 469–473 (1973). But see *State v. Jones*, 247 N.W.2d 733, 734 (Iowa 1976); *State v. Baskin*, 220 N.W.2d 882, 884–886 (Iowa 1974).

■ In any event, even if it be assumed defendant did, arguendo, preserve the error assigned we are not persuaded the State should have been required to specifically or in isolation, establish corroborative evidence beyond a reasonable doubt.

In *State v. Gates*, 246 Iowa 344, 351, 67 N.W.2d 579, 583 (1954), is this prefatory statement:

"No general rule can be stated with respect to the quantum of evidence corroborating an accomplice necessary to warrant a conviction. Each case must be governed by its own circumstances. Evidence which merely raises a suspicion the accused is the guilty party of course is not sufficiently corroborative of the testimony of an accomplice to warrant a conviction, but it is also not necessary that the testimony offered as corroboration be entirely inconsistent with innocence."

See generally *State v. Willman*, 244 N.W.2d 314, 315 (Iowa 1976). See also *State v. Jochims*, 241 N.W.2d 25; *State v. Nepple*, 211 N.W.2d 330 (Iowa 1973); *State v. Jennings*, 195 N.W.2d 351 (Iowa 1972); *State v. Neely*, 261 Iowa 1107, 156 N.W.2d 840 (1968); *State v. Gill*, 261 Iowa 522, 527, 154 N.W.2d 722 (1967).

■ Of course, the State must prove all elements of a crime charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 361–364, 90 S.Ct. 1068, 1071–1073, 25 L.Ed.2d 368 (1970); Code § 785.3.

Defendant apparently misconstrues both this mandate and the meaning of accomplice-corroborative evidence in urging it must be established by the historic quantum of proof noted in *Winship*. It will at this point be recalled Kocher was an accomplice in perpetration of the offense charged against King. Under these circumstances it was essential Kocher's testimony be corroborated as required by Code § 782.5, which provides:

"A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

■ It is commonly understood corroborating evidence, as instantly applied, is complementary to that previously given and tends to strengthen or confirm it; additional evidence of a different character on the same point. *Early v. State*, 13 Md.App. 182, 282 A.2d 154, 160 (1971); *State v. Eliason*, 279 Minn. 70, 155 N.W.2d 465, 468 (1968); *Edwards v. Edwards*, 501 S.W.2d 283, 289 (Tenn.App.1973). See also *Hasselstrom v. McKusick*, 324 F.2d 1013, 1018, 51 CCPA 1008 (1963); 1 Underhill's Criminal Evidence, § 185 (5th ed.); 23 C.J.S. Criminal Law § 809; Black's Law Dictionary, "Corroborating Evidence", at 414 (rev. 4th ed. 1968); cf. *State v. Lahmon*, 231 Iowa 448, 449–451, 1 N.W.2d 629 (1942).

■ Furthermore, the corroboration of an accomplice's testimony need not be strong, nor must it confirm every material fact testified to by the accomplice. It need only tend to connect an accused with the commission of a given crime.

Put in the abstract, as it is by defendant, we are satisfied the isolated "beyond a reasonable doubt" standard he here invites us to apply is misconceived. See *People v. Tewksbury*, 15 Cal.3d 953, 127 Cal.Rptr. 135, 147, 544 P.2d 1335, 1347 (1976).

■ Finally, in this vein the jury instructions given, viewed in their entirety, sufficed to place upon the State the requisite burden of proof, i. e., all elements of the offense charged beyond a reasonable doubt. See *State v. Tensley*, 249 N.W.2d 659, 662 (Iowa 1977).

IV. The question now to be answered is whether King's constitutional right to a fair trial was fundamentally impaired because of alleged judicial misconduct. More particularly, he asserts Judge Bown's possession of a revolver, during trial and within sight of the jury, marred the appearance of requisite judicial impartiality.

November 12, 1975, after return of the guilty verdict, King moved for a new trial and in so doing alleged:

"The fact became known to the jurors that the Honorable Thomas Bown, presiding Judge, kept a pistol in an open drawer on the bench, ostensibly for his protection from the Defendants, thus implanting in the minds of the jurors the false impression that the Defendants were violent and dangerous individuals."

Attached to the motion were affidavits by eight members of the jury. It thereby appears two jurors saw the revolver.

November 14, 1975, defendant's motion came on for hearing prior to sentencing.

During the new trial motion proceedings, Judge Bown stated the revolver (property of the prosecuting attorney) was placed in the drawer with his permission. The court further pointed out there were armed deputies in the courtroom and "it was not a situation where weapons were being kept out of sight". Finally the judge noted:

"I might say further, there was no intention on my part, and while I can't speak for Mr. Starr, * * * I am sure there was no intention on his part to have that revolver in the drawer visible to the jury. The reason it was observed is because in this Courtroom the jury, in coming into and out of the jury box, come up behind the bench where they could see behind the bench and see anything that might be in an open drawer. The drawer itself was ajar at times but the gun was sup-

posed, at all times, to be covered by a sheet of paper and how it happened to be uncovered, I don't know."

Defendant's new trial motion was overruled upon a finding that no prejudice resulted from presence of the gun.

In asking us to reverse this holding, defendant asserts: (1) Judge Bown's conduct marred the appearance of judicial impartiality to defendant's prejudice; (2) possession of the gun was so inherently and incurably prejudicial as to warrant a new trial; (3) reversible error was committed by requiring defendant to show actual prejudice resulted from jury observation of the revolver; (4) reversible error attended trial court's failure to conduct an examination upon which an objective evaluation as to resultant jury impartiality could be effected; and (5) any argument that the State's case against a defendant is strong cannot be used to justify denial of a new trial.

This court recently reviewed the matter of judicial misconduct in *State v. Larmond*, 244 N.W.2d 233, 235–236 (Iowa 1976), and there stated:

"A fair trial in a fair tribunal is a basic requirement of constitutional due process. (Citation). It follows a presiding judge should not only be fair and impartial, he must conduct himself in the trial to constantly manifest those qualities. *Wilson v. Ceretti*, 210 N.W.2d 643, 645 (Iowa 1973); Iowa Code of Judicial Conduct, Canon 3, Standards A(1), (3), C(1). A trial judge should project 'that atmosphere of austerity which should especially dominate a criminal trial and which is indispensable for an appropriate sense of responsibility on the part of court, counsel and jury.' (Citations).

"We have frequently said a presiding judge must avoid any conduct by which the jury could infer bias against either party, [Citations], noting jurors are particularly sensitive to a judge's views, and the revelation of his feelings toward the parties, counsel and witnesses might influence the jury more than the evidence. (Citations).

" * * *

"Nor do we feel in these circumstances defendant was required to show (as indicated by trial court's ruling) the jurors were actually prejudiced. It is enough that we find the mantle of impartiality indispensable to a trial court's function was discarded 'thereby demolishing the defendant's credibility, his presumption of innocence, and any chance whether guilty or innocent, that he had of a successful defense * * *.' (Citation) We are slow to hold matters calculated to arouse prejudice are non-prejudicial in a criminal case. *State v. Kimball*, [176 N.W.2d 864] at 867 [Iowa 1970]."

King argues, on the basis of the last portion of the above quoted opinion, trial court's conduct in this case must be deemed so inherently prejudicial that defendant was not required to show any actual influence upon the jury.

The problem we are now called upon to resolve is whether defendant's fair trial right was so impaired by the claimed judicial misconduct as to dictate a new trial. See generally 58 Am.Jur.2d, New Trial, § 50; 66 C.J.S. New Trial § 25. As aforesaid, King asserts Judge Bown's bench-drawer possession of a revolver, within occasional view of at least some jurors, so marred the requisite appearance of judicial impartiality as to create the denial of a fair trial. See *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976); *State v. Larmond*, 244 N.W.2d at 235.

At the outset a procedural enigma is encountered. More specifically, we must determine whether defendant preserved the present error, if any, for appellate review. In the first place it would appear the purported judicial misconduct was initially brought to the court's attention by defendant's post-verdict new trial motion. Had jury-view presence of the weapon come to defense counsel's attention during trial, an after the verdict challenge would have been untimely. *State v. Ware*, 205 N.W.2d 700, 702 (Iowa 1973); *Andrews v. Struble*, 178 N.W.2d 391, 401 (Iowa 1970). As best determinable, however, from a sparse record

on the subject it appears defendant was initially made aware of the gun's presence only after return of the guilty verdict, or at best following termination of trial proper. Under these circumstances this court elects to entertain the involved assignment.

Reduced to bare essentials, our task is to determine whether Judge Bown's questioned conduct served, in effect, to deny King a fair trial. In other words, was this unfortunate occurrence of such magnitude as to constitute prejudicial error?

We approach this matter mindful of the fact that not all errors in trial, even those of constitutional stature, necessarily dictate a reversal. See *Chapman v. State of California*, 386 U.S. 18, 21–23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *State v. Lanphear*, 220 N.W.2d 618, 622 (Iowa 1974). See also *State v. Rank*, 214 N.W.2d 136, 138 (Iowa 1974). It may be otherwise said an accused is only entitled to a fair trial, not a perfect one. *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972); *State v. Kelsey*, 201 N.W.2d 921, 927 (Iowa 1972).

It is also understood jurors cannot ordinarily impeach their verdict. *State v. Jackson*, 195 N.W.2d 687, 690 (Iowa 1972); *Osterfoss v. Illinois Central Railroad*, 215 N.W.2d 233, 237 (Iowa 1974); *State v. Washington*, 160 N.W.2d 337, 340–341 (Iowa 1968). Neither should jurors generally be permitted to testimonially support their verdict. See *Rayner v. Lindsey*, 243 Miss. 824, 138 So.2d 902, 906 (1962); 76 Am. Jur.2d, Trial, § 1236; 89 C.J.S. Trial § 523. But see 66 C.J.S. New Trial § 169p at 426. Consequently, to the extent affidavits by participating jurors purportedly exclude any verdict-related consideration of the bench-drawer presence of a revolver, they are disregarded.

Therefore, this court's evaluation of the instant subject is premised upon the totality of all other relevant circumstances shown by the entire record. See *Long v. Brewer*, 253 N.W.2d 549 (Iowa 1977).

As a condition precedent thereto, we must first ascertain the nature and extent of defendant's burden as to the showing of prejudice. Stated otherwise, was it incumbent upon King to establish identifiable actual prejudice, or probability of unfairness flowing from the isolated gun incident?

In light of our holding, *supra*, that the jurors could neither effectively impeach nor bolster their verdict, it becomes apparent any identifiable or isolatable proof of prejudice would have been presently unobtainable. Additionally where, as in this case, alleged essential unfairness is the crucial factor, we deem the "probability" test appropriate. *Estelle v. Williams*, 425 U.S. at 503, 96 S.Ct. at 1693; *Sheppard v. Maxwell*, 384 U.S. 333, 350–352, 86 S.Ct. 1507, 1516–1517, 16 L.Ed.2d 600 (1966); *Estes v. State of Texas*, 381 U.S. 532, 542–544, 85 S.Ct. 1628, 1632–1634, 14 L.Ed.2d 543 (1965); cf. *Osterfoss v. Illinois Central Railroad*, 215 N.W.2d at 237–238; *Pollard v. District Court of Woodbury County*, 200 N.W.2d 519, 520 (Iowa 1972). Parenthetically, it is manifest the instantly involved trial incident did not attain such magnitude that it per se constituted prejudicial misconduct. *State v. Johnson*, 243 N.W.2d 598, 602–603 (Iowa 1976); 24A C.J.S. Criminal Law § 1901. See also *State v. Hall*, 235 N.W.2d at 729. In other words, under these peculiar circumstances prejudice is not presumed.

As heretofore observed, King would have us hold the "presiding Judge kept a pistol in an open drawer on the bench, ostensibly for his protection from the Defendants, thus implanting in the minds of the jurors the false impression that the Defendants were violent and dangerous individuals." For reasons later stated, we do not elect to so restrict our analysis.

By way of exclusion, this court is satisfied *State v. Larmond* and *State v. Kimball*, both *supra*, are so factually distinguishable as to be of no force or effect in resolving the present issue. In *Larmond* the presiding judge telegraphed to the jury, by purposeful exclamations, gestures, and facial expressions, his deprecatory and hostile attitude toward the defense. And the *Kimball* presiding judge openly displayed hostility toward the accused by remarks made to him. In each cited case conduct unmistakenly calculated to convey a belief by the judge concerning guilt or innocence or tending to disparage the accused in the eyes of the jury was self-evident. But the factual situation in the case before us stands on an entirely different footing.

Contrary to defendant's view regarding the reaction of jurors who saw or heard of the revolver kept in the court bench drawer, it is just as plausible, reasonable, and proper to assume the jury (1) gave it no meaningful thought, or (2) attributed its presence to an overlooked exhibit in some other case, or (3) deemed its presence a usual custom or practice by Judge Bown. This version is buttressed by the fact that prior to return of the guilty verdict nothing was ever said or done which in any manner whatsoever directly or indirectly connected the revolver to the case then on trial, or to either defendant. Thus *State v. Wendel*, 532 S.W.2d 838 (Mo.App.1975), cited by defendant, is inapposite.

Viewed in totality, we find nothing in the record which can be said to show either actual or probable prejudice attended mere presence of a revolver in the court bench drawer. Although Judge Bown's questioned conduct hardly merits the stamp of approval, it did not serve to deny King a fair trial in the constitutional sense, or otherwise.

V. Finally, defendant postulates his right to a fair trial was denied because he was precluded from showing a claimed prosecutorial inducement for Lawrence Kocher's testimony. His supportive argument is twofold. First, he asserts trial court erroneously overruled his motion to disqualify the prosecuting attorney. Second, defendant contends he was denied due process because of "deliberate deception and nondisclosure by the State of its understanding with Lawrence Kocher relating to his testimony and the State's plans regarding future prosecution". Both arguments are based on the same factual array.

Prior to trial, both defendants moved for disqualification of Assistant County Attorney Donald Starr because they intended to call him as a witness. At hearing on said motion, Starr testified regarding his several discussions with Lawrence Kocher regarding the latter's testimony as a State witness. He denied having stated the prosecution would be helpful to Kocher if he would cooperate, stating: "I think the only thing I have said to [Kocher's attorneys] or Mr. Kocher is that the County Attorney's office has not decided what we are going to do with him." Starr also said the only charge pending against Kocher at time of trial was based upon a preliminary information. He added that Kocher had waived his right to a speedy trial.

The prosecutor further denied any knowledge of a conversation to the effect the State may only charge Kocher with conspiracy to rob in exchange for his testimony. In addition, Starr testified he had not talked to Kocher about a conspiracy sentence, immunity or any kind of leniency in return for his testimony. He stated that to the best of his knowledge, no one had talked with Kocher about leniency.

In denying defendant's pretrial motion trial court held that Starr was competent to testify and either defendant could call him as a trial witness.

Lawrence Kocher, testifying in course of trial, stated on cross-examination, there had been no deals, promises or threats made for his testimony. He also denied anyone had told him he might get three years on a conspiracy charge in return for his evidence.

Robert Laden, one of Lawrence Kocher's attorneys, testified at trial there had been about six plea bargaining discussions by him and his associates with Mr. Starr regarding their client. Laden said Starr had mentioned the possibility of a ten year sentence, and discussed the chance of a three year conspiracy sentence. Laden added, however, no guarantee of any kind as to disposition of Kocher's case had been made and he did not know what his client's ultimate outcome would be. Attorney Laden also testified he had conveyed all information about these negotiations to his client and had no idea why Kocher would deny having discussed such matters with anyone.

Immediately after Laden's testimony, defendant again unsuccessfully moved for a mistrial on the ground Starr should have been disqualified as the prosecuting attorney.

Donald Starr later testified in course of hearing on defendant's new trial motion. He stated the charge against Kocher had been dismissed in toto the day after the jury returned a guilty verdict against defendant. This witness further reaffirmed the fact that at no time prior to the dismissal did Kocher know the charges were going to be dismissed or that favorable disposition of his case was possible in exchange for his testimony. Starr additionally stated he specifically told Kocher's attorneys no final disposition of their client's case would be decided upon until after return of the Armento-King verdict. Finally, Starr testified Lawrence Kocher was not released in return for his evidence.

In response to a question by the court, Starr indicated Robert Laden's testimony stood as a fair and accurate statement of the Kocher plea negotiations. The court then added:

"* * * I think the jury was fully aware of whatever the status was of the negotiation regarding the ultimate disposition of Mr. Kocher's case from the testimony of Mr. Laden. I want to say further that I personally had no knowledge of what the ultimate disposition of Mr. Kocher would be until the 10th day of October after the jury had come in. The fact that the charge against him would be released and that I would be asked to dismiss was not communicated to me until the 10th. Neither Mr. Starr nor County Attorney Fenton had any way of knowing until I in fact signed the order whether or not I would sign the order."

Trial court then denied defendant's motion for a new trial.

King now asserts that although the trial judge was "technically correct" in finding Mr. Starr to be a competent witness if called, defendant was denied a fair trial by the court's refusal to request that Starr withdraw from the case. We do not agree.

This court recently held the question as to whether a defendant should be allowed to call a prosecuting attorney as a witness is a matter committed to trial court's sound discretion. *State v. Brewer*, 247 N.W.2d 205, 212 (Iowa 1976). See also *United States v. Newman*, 476 F.2d 733, 738 (3d Cir. 1973); *Johnson v. State*, 23 Md.App. 131, 326 A.2d 38, 44–45 (1974), and citations.

Understandably a government prosecutor should not take the stand in order to impeach the testimony of State witnesses unless it is unavoidably necessary. *United States v. Torres*, 503 F.2d 1120, 1126 (2d Cir. 1974). Such a procedure, inevitably confusing the distinctions between advocate and witness, argument and testimony, is acceptable only if required by a compelling and legitimate need. *United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir. 1975); cf. *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 2177, 45 L.Ed.2d 141 (1975) (White, J., concurring).

Although a prosecutor should withdraw upon finding it necessary to testify on behalf of the State, he has no such duty when called as a defense witness. *Chessman v. Teets*, 239 F.2d 205, 214 (9th Cir. 1956), vacated on other grounds, 354 U.S. 156, 77 S.Ct. 1127, 1 L.Ed.2d 1253 (1956); *United States v. Maloney*, 241 F.Supp. 49, 51 (W.D.Pa.1965); Annot., 54 A.L.R.3d 100, § 16 (1973).

Defendant's pretrial Starr-exclusion motion was based on the proposition the defense might call Mr. Starr to the witness stand. It would appear the motion was premature. As noted above this is a matter resting in trial court's discretion and the exercise thereof is governed by status of the evidence at the time defendant wishes to make his move. See *State v. Howard*, 27 Ariz.App. 339, 554 P.2d 1282, 1285 (1976); *United States v. Maloney*, 241 F.Supp. at 50–51. The court below was therefore fully justified in overruling defendant's motion prior to introduction of any testimony.

Trial court was similarly warranted in overruling defendant's new trial motion based upon the same premise. The simple fact is, defendant never called Mr. Starr to testify. The court made no ruling thereon and we have nothing to review. Defendant's request for disqualification of the prosecuting attorney was properly denied. See *State v. Howard*, 554 P.2d at 1285–1286.

Defendant also contends the prosecution failed to disclose an existing "understanding" between the State and Kocher regarding his testimony and future prosecution plans. In essence, King argues the prosecution allowed a false impression to be created at trial when the "truth" would have directly impugned the veracity of its key witness. Again we cannot agree.

Without question defendant was entitled to information with respect to any promises or assurances made to Kocher in order to secure his testimony, although he was not entitled to full freedom of choice as to the methodology by which to obtain same. *State v. Brewer*, 247 N.W.2d at 211.

Moreover, the State may not suppress exculpatory evidence. If it had done so, the accused would have been entitled to appropriate relief, including a new trial. *State v. Van Rees*, 246 N.W.2d 339, 345 (Iowa 1976); *State v. Hummell*, 228 N.W.2d 77, 80–81 (Iowa 1975); *State v. Peterson*, 219 N.W.2d 665, 674 (Iowa 1974).

Similarly, the United States Supreme Court has consistently held a conviction obtained by knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood the false testimony could have affected judgment of the jury. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976), and citations.

Also, a convicted party is entitled to a new trial if he proves the State intentionally or inadvertently failed to correct materially false testimony relevant to credi-

bility of a key State witness, including evidence concerning "any understanding or agreement as to a future prosecution" between a witness and the government. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *United States v. Sutton*, 542 F.2d 1239, 1243 (4th Cir. 1976); *Boone v. Paderick*, 541 F.2d 447, 450–451 (4th Cir. 1976); *United States v. Harris*, 498 F.2d 1164, 1168 (3d Cir. 1974), cert. den., 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974); *United States v. Kaplan*, 470 F.2d 100, 103 (7th Cir. 1972), cert. den., 410 U.S. 966, 93 S.Ct. 1443, 35 L.Ed.2d 701 (1973).

In *Giglio* and *Napue*, co-conspirators testifying against the defendants did so falsely, in response to questioning by defense counsel, that they had received no prosecutorial promises. The government failed to disclose promises had in fact been made. Under these circumstances the Court held suppression by the prosecutor's office of material evidence denied defendants their respective rights to due process of law. See also *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Here, however, the record does not reveal the prosecutor suppressed any such material evidence. As aforesaid, he declared under oath no assurances had been given in exchange for Kocher's testimony and defendant elicited no contradictory evidence. Admittedly, Kocher's attorney testified there had been plea bargaining and the prosecutor conceded as much. But no one testified that an "understanding" had been reached or any promises had in fact been made. Neither are we prepared to assume a plea bargain was consummated merely because charges against Kocher were dropped the day after return of the verdict.

Thus, the rationale underlying the Court's determination in *Giglio* and *Napue* is inapplicable to the facts presented by this record. As in *United States v. Hykel*, 461 F.2d 721, 727 (3d Cir. 1972):

"The present case is not like *Giglio v. United States* * * *. The opinion in that case makes clear that where a key Government witness has been promised that he will not be prosecuted if he testifies, a failure to disclose the promise may deny a defendant due process of law. In the present case, however, there is no evidence that the Government made any such promise * * *."

See also *United States v. Gross*, 511 F.2d 910, 920 (3d Cir. 1974); *United States v. Newman*, 476 F.2d at 738; *United States ex rel. Dale v. Williams*, 459 F.2d 763, 765 (3d Cir. 1972).

We therefore agree with trial court in concluding the jurors knew all existing facts regarding plea negotiations when they retired to deliberate. Defendant has failed to show any "agreement" or "promise" existed before that time and produced no other related evidence which could "[in] any reasonable likelihood have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397.

In summary, trial court did not err in overruling defendant's motion to disqualify Mr. Starr. Moreover, because no evidence was adduced which directly or indirectly revealed a promise by the State not to prosecute Kocher in return for favorable testimony, we cannot say the prosecution failed to disclose false testimony. Neither can it be said the State withheld material evidence as to an existing fact.

All issues here raised by defendant Marion Archer King have been considered and found to afford him no basis for appellate relief.

AFFIRMED.

All Justices concur.